[Cite as *Simon v. Aulino*, 2020-Ohio-6962.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ADAMS COUNTY

| | | |
|---|---|---|
| Cathy Lynn Simon, | : | Case No. 18CA1076 |
| Plaintiff-Appellee/<br>Cross-Appellant, | : | |
| | : | |
| v. | : | <u>DECISION AND</u> |
| | : | <u>JUDGMENT ENTRY</u> |
| Paula Lee Aulino, | | |
| | : | |
| Defendant-Appellant/<br>Cross-Appellee. | : | **RELEASED 12/23/2020** |

<u>APPEARANCES</u>:

Patrick Kasson, Reminger Co., L.P.A., Columbus, Ohio for Defendant-Appellant/Cross-Appellee.

Brian S. Sullivan, Sarah B. Cameron, Dinsmore & Shohl, LLP, Cincinnati, Ohio and John B. Caldwell, Young & Caldwell, LLC, West Union, Ohio for Plaintiff-Appellee/Cross-Appellant.

Hess, J.

{¶1} This case involves an intense dispute between two sisters, Cathy Simon and Paula Aulino, over the inheritance left by their father Wayne Chamblin. Cathy Simon learned that their father effectively disinherited her and sued her sister Paula Aulino, believing that Paula wrongfully caused their father to disinherit her. The jury agreed that Paula Aulino acted wrongfully and awarded damages to Cathy Simon. Paula Aulino appeals claiming she did nothing wrong and Cathy Simon cross-appeals claiming she is entitled to even greater monetary damages than the jury awarded.

{¶2} Defendant-Appellant/Cross-Appellee Paula Lee Aulino appeals the trial court's denial of her motions for a directed verdict and judgment notwithstanding the

verdict following a jury trial in which Paula Aulino was found liable for tortiously interfering with the inheritance of her sister Cathy Simon, breaching her fiduciary duties to her sister and liability to her under promissory estoppel. Aulino also appeals the jury verdict contending it should be overturned because of opposing counsel's misconduct at trial.

{¶3} Paula Aulino's sister, Plaintiff-Appellee/Cross-Appellant Cathy Lynn Simon, cross-appeals the trial court's denial of her motion for a new trial and judgment notwithstanding the verdict on damages. Cathy Simon contends that the damage award of $330,693.00 was inadequate, too small and against the manifest weight of the evidence and she sought to increase damages, which the trial court denied.

{¶4} Paula Aulino raises three assignments of error for our review. The first two are related and we consider them together. First, she contends that the trial court erred in denying her motions for a directed verdict and judgment notwithstanding the verdict because there was no evidence to support the jury's verdict that she breached a fiduciary duty, that she unduly influenced their father so that he disinherited Simon, or of Simon's reliance on Aulino's promise to give half of her inheritance to Simon. Second, Aulino contends that the verdict was against the manifest weight of the evidence.

{¶5} We find that the evidence supports the jury's finding that Wayne Chamblin could be influenced by reason of advanced age, physical infirmities, and mental condition. A number of witnesses testified that Chamblin was an elderly person in his mid-to-late 70s, had suffered a prolonged period of depression after his wife's death, had closed his family furniture business for a period of time, had a number of very serious health issues, and was susceptible to financial exploitation and manipulation by others.

**{¶6}** Sufficient evidence exists to support the jury's verdict that Aulino exerted undue influence over Chamblin, which caused him to execute certain transfer on death directives to Aulino on the assets at issue. Evidence of Chamblin's age and mental state during the time periods of the transfers at issue, his love and value of family and forgiveness, his pride in and love for Simon, the conversations he had with others, the provisions of his will, the timing, frequency, and intensity of Aulino's conversations with Chamblin in late 2007 to early 2008, and the influence Aulino exerted over him in 2010 are all factors for the consideration of the jury. The jury could reasonably infer from the circumstances that Aulino used Simon's ex-husband, Ed West, West's lies, and Chamblin's emotional breakdown stemming from West's lies, to exercise undue influence over Chamblin and cause him to make the transfers to her at a time when she was admittedly "as mad as hell" at Simon. The jury could also reasonably infer that in 2010 Aulino exercised undue influence over Chamblin, a man she believed to be susceptible to financial exploitation, to transfer management of his retirement accounts to Aulino's father-in-law and to execute a transfer on death directive to Aulino as a means of diverting the funds away from Chamblin's direct control and securing them for herself. We overrule Aulino's first and second assignments of error.

**{¶7}** In her third assignment of error, Aulino contends the verdict should be overturned because of Simon's counsel's misconduct at trial. However, Aulino did not object to any of the questions or statements she now contends were improper and has forfeited all but plain error. This is not one of the extremely rare civil cases in which plain error challenging the legitimacy of the underlying judicial process itself occurred. We overrule Aulino's third assignment of error.

{¶8}    Cathy Simon raises two assignments of error in her cross-appeal. She contends that the trial court erred in denying her motion for a new trial on damages and in denying her motion for judgment notwithstanding the verdict as to damages. However, Simon presented very little testimony to help the jury understand her evidence of damages. She also included a number of assets owned by Chamblin Furniture Co., which were not owned by Wayne Chamblin and would not have transferred to Aulino upon Chamblin's death. Based on our review of the record, the jury did not lose its way. The compensatory damage award is not against the manifest weight of the evidence, nor is it too small or inadequate. As to the punitive damage component of her claim, she did not object to the procedure the court employed to address the inconsistency between the punitive damages and attorney fee awards. Thus, she waived any errors in the manner in which the court addressed the inconsistency.

{¶9}    We affirm the trial court's judgment.

## I. PROCEDURAL BACKGROUND

{¶10}   Paul "Wayne" Chamblin died in February 2016. He was survived by his two daughters, Paula Aulino and Cathy Simon. Wayne Chamblin's will devised his estate equally to his two daughters. However, he transferred significant assets by "transfer on death" directives to Aulino during the years prior to his death, resulting in significantly fewer assets to be devised under the will.

{¶11}   In June 2016, Simon filed a complaint against Aulino asserting claims for tortious interference with expectancy of inheritance, a declaratory judgment that the transfer on death directives were invalid and ordering them returned to Chamblin's estate, promissory estoppel, constructive trust, breach of fiduciary duty and resulting conversion

of trust assets. Simon alleged that prior to his death, her father Wayne Chamblin owned a furniture store, Chamblin Furniture Co., real estate, and bank accounts totaling over $1 million. She alleged that although his will devised all of the assets to Simon and Aulino equally, Aulino unduly influenced their father into leaving Aulino substantially all of his assets upon death. Simon alleged that when she divorced her husband, Ed West, and moved to Georgia in November 2007, Aulino began a "smear campaign" against her to their father and engaged Simon's ex-husband West to join Aulino in her efforts. As a result, Chamblin executed transfer on death directives for all of his assets in favor of Aulino. As a result of Aulino's interference with her expectancy of inheritance, Simon contends that she was entitled to half of Chamblin's assets.

{¶12} Simon asserted additional alternative legal claims, which if proven would also entitle her to an award of half the assets. She sought a declaratory judgment that Aulino procured the transfer-on-death directives by undue influence and fraud. She contended that Aulino's status as Chamblin's power-of-attorney placed her in a fiduciary capacity for which undue influence is presumed. Simon sought a declaration that all transfer on death directives were invalid, and the assets should be returned to Chamblin's estate. Simon alleged that shortly before Chamblin died, Aulino promised to give Simon half of the assets Aulino acquired upon their father's death and Simon relied on the promise by not seeking a way to revoke the transfer on death directives before their father died. Thus, Simon was entitled to half the estate assets under the theory of promissory estoppel. Simon asked the trial court to impose a constructive trust over half of the assets. Last Simon alleged that her father created a trust when he executed the transfer on death

directives in favor of Aulino, with Aulino as the trustee. Simon alleged that Aulino breached her fiduciary duties under the trust by withholding Simon's half of the assets.

**{¶13}** Aulino filed a motion to dismiss for lack of subject matter jurisdiction and a motion for summary judgment; the trial court denied both motions. The case proceeded to a jury trial.

**{¶14}** The jury returned a verdict in favor of Cathy Simon and awarded compensatory damages of $330,693. The jury found that Paula Aulino intentionally interfered with Simon's expectancy of inheritance from their father and Simon suffered damages as a result. They also found Aulino liable to Simon for promissory estoppel and that Aulino breached her fiduciary duty to Simon as trustee under an oral trust. However, they found that Chamblin did not create a trust over Simon's share of assets. Although the jury did not award Simon punitive damages, they answered affirmatively when asked to award Simon attorney fees. The trial court entered judgment in favor of Simon in the amount of $330,693, plus costs and post-judgment interest, but denied her declaratory judgment request.

**{¶15}** Both Simon and Aulino filed post-trial motions. Aulino sought a judgment notwithstanding the verdict as to her liability. Simon sought a new trial on damages, or alternatively an additur or a judgment notwithstanding the verdict. The trial court denied both motions.

**{¶16}** Paula Aulino appealed and Cathy Simon cross-appealed.

## II. ASSIGNMENTS OF ERROR

**{¶17}** Paula Aulino assigns three errors for review:

I. THE TRIAL COURT ERRORED [SIC] TO THE PREJUDICE OF MS. AULINO BY NOT GRANTING MS. AULINO'S MOTIONS FOR DIRECTED VERDICT AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.

II. THE TRIAL COURT ERRORED [SIC] TO THE PREJUDICE OF MS. AULINO BY NOT GRANTING HER A JUDGMENT NOTWITHSTANDING THE VERDICT BECAUSE THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

III. THE VERDICT SHOULD BE OVERTURNED DUE TO MS. SIMON'S COUNSEL'S MISCONDUCT AT TRIAL.

{¶18} Cathy Simon assigns two errors for review:

I. THE TRIAL COURT ERRED IN DENYING PLAINTIFF-APPELLEE/CROSS-APPELLANT'S MOTION FOR A NEW TRIAL ON DAMAGES.

II. THE TRIAL COURT ERRED IN DENYING PLAINTIFF-APPELLEE/CROSS-APPELLANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AS TO DAMAGES.

III. LEGAL ANALYSIS OF AULINO'S APPEAL

A. Standard of Review

{¶19} In her first two assignments of error Aulino asserts that the trial court erred in denying her motion for directed verdict and her motion for judgment notwithstanding the verdict. Both a motion for a directed verdict and a motion for judgment notwithstanding the verdict test the sufficiency of the evidence and therefore present a question of law which we review de novo. *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 25. In deciding a motion for directed verdict under Civ.R. 50(A) or a motion for a judgment notwithstanding the verdict under Civ.R. 50(B) the court must construe the evidence in favor of the nonmoving party. Only if the court finds that upon any determinative issue reasonable minds could come to but one conclusion and the moving party is entitled to judgment as a matter of law, the court must grant the motion. *Vance v. Consol. Rail Corp.,* 73 Ohio St.3d 222, 231, 652 N.E.2d 776 (1995); *Bungard v. Jeffers,*

2014-Ohio-334, 8 N.E.3d 336, ¶ 11 (4th Dist.). In doing so, a trial court may not weigh the evidence or judge witness credibility. *Id.* at ¶ 11; *Martin v. Jones*, 2015-Ohio-3168, 41 N.E.3d 123, ¶ 35 (4th Dist.). If there is a rational basis for the jury's verdict, a court must not intercede. *Krannitz v. Harris*, 4th Dist. Pike No. 00CA649, 2001-Ohio-2683, *3.

**{¶20}** Because the standard for directed verdict is the same as for judgment notwithstanding the verdict, our finding as to the assignment of error on one of the motions supports the same finding on the other motion. *See Redman v. Watch Tower Bible and Tract Soc. Of Pennsylvania*, 6th Dist. Wood No. 91WD071, 1992 WL 193533, *7 (Aug. 14, 1992).

B.  Intentional Interference with Expectancy of Inheritance

**{¶21}**  In her first two assignments of error, Aulino argues that the trial court erred as a matter of law when it denied her motions for a directed verdict and for a judgment notwithstanding the verdict on Simon's claim for intentional interference with expectancy of inheritance.

**{¶22}** The essential elements of a claim for intentional interference with an expectancy of inheritance are: (1) an existence of an expectancy of inheritance in the plaintiff; (2) an intentional interference by the defendant; (3) conduct by the defendant involving the interference which is tortious in nature, such as fraud, duress or undue influence; (4) reasonable certainty that the expectancy of inheritance would have been realized but for the interference by the defendant; and (5) damages. *Firestone v. Galbreath*, 67 Ohio St.3d 87, 88, 616 N.E.2d 202, 203 (1993). "Undue influence occurs when the wishes and judgment of the transferor are substituted by the wishes and

judgment of another." *Grimes v. Grimes*, 4th Dist. Washington No. 08CA35, 2009-Ohio-3126, ¶ 36.

### 1. Susceptibility

**{¶23}** Aulino challenges the second and third element of the claim and argues that there was no evidence that her father was susceptible to undue influence or that she exercised undue influence over him to interfere with Simon's inheritance. She argues that because there was testimony that Chamblin was strong-willed and not suffering from mental health problems or declining cognitive abilities, he was not susceptible to undue influence at the time of the transfers in late 2007 and early 2008 and in 2010. Simon contends that the record contains substantial competent evidence that Chamblin was in a weakened physical, mental, and emotional condition that made him susceptible to undue influence. Chamblin was born in October 1932, was 83 years old at the time of his death, and in his mid-to-late 70s during the relevant time period.

**{¶24}** Wayne Chamblin's brother Milton Chamblin testified that Wayne Chamblin and his wife Joyce had been married and operated the Chamblin Furniture Co. together for over 40 years before Joyce Chamblin died in 2003. Milton testified that Wayne was devastated by the death of his wife and he eventually closed the Chamblin Furniture Co. because business had slowed and Wayne lacked the desire to operate the store after Joyce died even though the store "was where his life was." Milton testified that the store closing, which occurred in December 2005, left Wayne with nothing to do in his life. Milton testified that Wayne decided to reopen the furniture store in May 2008 because Wayne was tired of having nothing to do and had explained to Milton that he had formed a corporation with his daughters and the three of them were partners. Wayne explained to

Milton that this would allow the company to pass directly to his two daughters and avoid probate. Milton testified that Wayne was not a vengeful person and would not take action to get back at a person.

**{¶25}**  Kathy Meade testified that she knew Wayne Chamblin since she was a child and, as an adult, had worked at the furniture store after Wayne's wife died. Meade testified that the loss of his wife was a devastating event for Chamblin and he was a "lost" man; for more than a year after her death, Chamblin went to the graveyard to visit his wife's grave and sat for an hour each day. Meade testified that the furniture store was Wayne's "ministry" and "was more than a job." Meade testified that Chamblin "went through a really deep depression" and "wasn't fixing his hair like he did every day. His clothes were not perfect."

**{¶26}**  Meade testified that Chamblin appeared to come out of his depression when he started spending time with Dr. Susan Blanton,[1] a woman he started a relationship with in late 2008.  Meade testified that Chamblin told her that he was "smitten" with Dr. Blanton. Chamblin asked Meade not to tell anyone because he had not had a chance to tell Simon and Aulino about the relationship. Meade testified that later Chamblin was "all tore up again and very upset." Meade said Chamblin told her that he had ended his relationship with Dr. Blanton because his daughters did not like him being in the relationship, believed that Dr. Blanton was using him for his money, and believed that he was spending too much money on her. Meade testified that Chamblin told him that instead of spending time with Dr. Blanton, Paula Aulino had asked Chamblin to visit her on the weekends. Meade

---

[1] In the record, Dr. Susan Blanton is also referred to as Dr. Susan Reed or Dr. Susan Duncan.

testified that Chamblin ended his relationship with Dr. Blanton even though it appeared to Meade to be something that Chamblin did not want to do.

**{¶27}** Cathy Simon also testified that Paula Aulino told her she thought Dr. Blanton was taking advantage of Chamblin during 2010. Simon testified that Aulino called Simon and asked her to come up from Georgia so the two of them could talk to Chamblin, "like an intervention." Simon testified that she and Aulino went to dinner with Chamblin and Dr. Blanton. Simon could see that Chamblin was happy and she told Chamblin that she wasn't unhappy about the relationship, but she only wanted to make sure he was not taken advantage of and that if he wanted to be in a relationship with Dr. Blanton, he should.

**{¶28}** Meade testified that she was cleaning the furniture store one day and found a photograph of Cathy Simon with an unknown man on a bookshelf in Wayne Chamblin's office. Meade asked Chamblin about it and he told her that Simon was living with the man in Georgia. Chamblin told Meade that he had not spoken to Simon about it and Simon did not know he had the photograph, but that he had heard from a "good authority" that Simon was living with the man. Meade testified that she had never seen Chamblin so angry. Chamblin told Meade that he was going to cut Simon out of his will. Meade said she asked Chamblin if he planned to do this without even talking to Simon and he replied "Oh, I know things" and "I have it on good authority." Chamblin told Meade that he had also been in contact with Ed West, Simon's ex-husband, and that Chamblin had had dinner with Aulino and West. Meade testified that rather than being a photograph of a live-in boyfriend, she believed the photograph showed Simon displaying a room she had designed with furniture she had sold to the man in the photograph.

**{¶29}** Meade testified that the intensity of anger Chamblin experienced over the photograph "just floored" her as she had never seen him so angry. Meade testified that she spoke to Chamblin several times about his will and that "it tore me up because I can't imagine. Wayne is the most loving man I've ever met. He really is. Loving father. What would ever – who could possibly make him think something was true that would turn him against his own flesh and blood."

**{¶30}** Meade testified that her own brother had drug addiction issues and she had not spoken to him in several years. When Meade learned her brother was hospitalized, Chamblin told her to go to the hospital because "we don't turn our backs on family. Everybody gets a second chance." When Meade's brother turned his life around, Chamblin gave Meade $500 and some furniture to help him out. Meade testified that Chamblin's reaction to Simon was such a departure of character that she told Chamblin that Simon had confided in Meade that Simon's marriage to Ed West was like a brother-sister relationship and she had been very lonely for years. Meade said Chamblin's reaction to this information was that he was "really shocked."

**{¶31}** Meade said that several years later she had a follow up discussion with Chamblin about Simon and the will and Chamblin told her that Simon had her life on the right track, and he was thrilled and proud of her. As for his will, Chamblin told Meade that it would go back to the original will and that he had not altered the will. Meade testified that Chamblin believed strongly in forgiveness and that he had restored his relationship with Simon completely and Simon had moved back into the family home with Chamblin and was helping with the furniture store. Meade testified that Chamblin talked about going into business together with Simon and Aulino.

{¶32} Richard Throckmorton testified that he knew Chamblin for the past 20 years and he considered Chamblin his best friend. Throckmorton testified that Chamblin was not a vengeful person and did not hold grudges. Throckmorton testified that it took Chamblin "quite a few years" to get over the death of his wife and when Chamblin became involved with Dr. Blanton it was the first time Chamblin had been happy since his wife died. Throckmorton testified that Chamblin paid him to install a new roof on Dr. Blanton's medical office building and for a new roof, floor coverings, paint and the installation of 20 new windows at Dr. Blanton's home. Throckmorton asked Chamblin about it and "probably got more involved than I probably should have. And then I just backed off because Wayne seemed happy. So I just let – backed off of that."

{¶33} Simon testified about her father's health issues, his kidney, prostate and skin cancers, and his heart issues. Simon testified that Chamblin had one kidney removed and was very fearful of losing his other kidney because Chamblin's brother had been on dialysis. Simon testified that concerns for his kidney made Chamblin "fanatical" about his diet. Simon testified that Chamblin was devastated by the death of his wife, closed the furniture store, was lonely and depressed, and had a hard time dealing with the loss for many years.

{¶34} Bryan Swords worked at Chamblin's furniture store from 2009 until it closed after Chamblin died. He testified that Chamblin went into kidney failure in 2012 and Simon moved from Georgia back to Ohio and moved in with Chamblin to take care of him and help him run the furniture business. Simon opened a fashion boutique inside the furniture store that brought more customers into the store. Swords testified that after Chamblin's kidney failure in 2012, Chamblin was always tired and was on a vegan diet for health

reasons. Swords would come into Chamblin's office to find him asleep in a chair or asleep with his head down on his desk. Swords would walk away, leaving Chamblin to rest.

{¶35} Dr. Parrott, Chamblin's family physician also testified about the severity of Chamblin's medical conditions and Chamblin's medical records were admitted as an exhibit.

{¶36} Both Simon and Aulino testified about another period in which Chamblin had been financially exploited. They testified that they had been unaware that a neighbor, Steve Osmond, was receiving money from Chamblin and these transfers began in 2013 when Chamblin was 81 years old and continued until a month before Chamblin died. The amount of the transfers ranged from $450 to $6000 and totaled over $28,000 by the time of Chamblin's death. Simon testified that Chamblin told her he had loaned Osmond a small sum of money but it was not until Chamblin was near death that both she and Aulino discovered the frequency and size of the monetary transfers. (Tr. 937) Aulino testified she did not know about the transfers until Chamblin was hospitalized in 2016.  Aulino testified that she was concerned that Osmond was taking advantage of her father, she contacted the family attorney, and texted a message to Simon, "Sounds like he [Osmond] took advantage of an elderly person."

{¶37} Aulino testified that in 2010 she believed Chamblin was being financially exploited by Dr. Blanton.  Aulino convinced Chamblin to sever his relationship with Dr. Blanton. Aulino testified that 2010 was also the year Chamblin changed investment accounts to be transfer on death to Aulino and changed the management of the investments to Aulino's father-in-law at Wells Fargo.  Telephone records show that Aulino

spoke to Chamblin the same day he called Wells Fargo but she denies having any knowledge of the transfer on death designation.

**{¶38}** We find sufficient evidence in the record for the jury to find by clear and convincing evidence that Wayne Chamblin could be influenced by reason of advanced age, physical infirmities, and mental condition. Chamblin was an elderly man in his mid-to-late 70s. A number of witnesses testified that Chamblin had suffered a prolonged period of depression that started when his wife died in 2003 and continued up through late 2008, he had closed his family furniture business for a period of time beginning in late 2005 through mid-2008, which resulted in a loss of social contact and life purpose, had a number of very serious health issues, and would yield to the will or desires of others on financial matters.

**{¶39}** There was evidence that Throckmorton, Aulino, and Simon were all concerned he was being financially exploited by Dr. Blanton during that relationship which began in late 2008. Even though many witnesses, including Aulino and Simon, described Chamblin as "strong-willed" and his family physician, Dr. Parrott, did not believe Chamblin suffered from mental health issues or cognitive decline, evidence of dementia or mental illness is not required to show a person is susceptible to undue influence. A number of witnesses testified that Chamblin was profoundly depressed and isolated during 2007 and 2008. Aulino and Simon believed their father was susceptible as an elderly person to financial exploitation by Dr. Blanton in 2010 and Osmond beginning in 2013. There was sufficient evidence for a reasonable person to conclude clearly and convincingly that Chamblin could be improperly influenced during the time periods the transfers occurred.

2. Evidence of Undue Influence or Fraud

{¶40} Aulino contends there was no evidence that she exerted undue influence over Chamblin. Simon contends that while there may not be direct evidence, there was more than sufficient indirect evidence for the jury to reach this conclusion.

{¶41} Exercise of undue influence "need not be shown by direct proof, but maybe inferred from the circumstances." *Calloway v. Roy,* 10th Dist. Franklin No. 77AP-301, 1977 WL 200400 (Sept. 8, 1977). Where there is evidence sufficient to raise a question of undue influence, a jury verdict finding that undue influence occurred will not be disturbed by a reviewing court. *Id.* We recognize the "inherent difficulty a plaintiff faces in proving the allegations of undue influence." *Rich v. Quinn,* 13 Ohio App.3d 102, 104, 468 N.E.2d 365 (12th Dist. 1983). "[I]ssues related to undue influence are generally determined upon circumstantial evidence and inferences drawn from a full presentation of facts which may be inconclusive when viewed separately * * * ." *Bd. of Edn. Of Pickaway Tp. Rural School Dist. v. Phillips,*103 Ohio St. 622, 626, 134 N.E. 646, 648 (1921) (finding the trial court erred in removing the issue of undue influence from the jury's consideration). "[T]he evidence concerning the mental and physical condition of the testator, his habits of life, his conversations * * * with other persons more or less interested, the provisions of the will itself, all of these matters present a situation for the consideration of the jury." *Id.* "Different minds might reasonably differ as to the inference to be drawn from the competent evidence, and it was the duty of the jury to draw these inferences after considering all the circumstances in the case in light of the evidence * * *." *Id.* at 627. Additionally, "the existence of a family or a confidential or quasi-confidential relationship" between the parties to the transaction is "an important factor in determining

the presence of undue influence." *Grimes v. Grimes,* 4th Dist. Washington No. 08CA35, 2009-Ohio-3126, ¶ 40.

**{¶42}** In 2003 Wayne Chamblin prepared a will in which he distributed all of his property to Simon and Aulino equally, he executed a power of attorney naming both Simon and Aulino, and he executed a health care power of attorney naming both Simon and Aulino as alternate agents. The parties point to two periods that Chamblin changed his estate plans. First in December 2007 to February 2008 and then again in November 2010.

**{¶43}** During the first time period, after spending Christmas Day with Ed West (Cathy Simon's ex-husband) and Paula Aulino, on December 26, 2007, Chamblin and Aulino went together to the bank and changed the signatures on the Chamblin Furniture corporate bank account to remove Simon from the account. The next day, December 27, 2007, Chamblin changed the beneficiary on his life insurance policy to make Aulino his sole beneficiary. Then Chamblin contacted his attorney, John Lawler, in January 2008 to (1) change the deed to his home to a transfer on death deed to Aulino, which was recorded February 1, 2008; (2) change Chamblin's shares in Chamblin Furniture to make them transfer on death to Aulino;  and (3) create new power of attorney, healthcare power of attorney and living will giving those powers to Aulino.

**{¶44}** John Lawler, Wayne Chamblin's attorney, testified that Chamblin met with him in mid-January 2008 to discuss these changes.  Lawler testified that Chamblin told him his motivation for the change was Simon's divorce from Ed West and that Chamblin was also interested in avoiding probate.  Lawler testified that Chamblin told him that

Aulino would manage it and "do the right thing." Lawler testified that he sent a copy of all of the documents, including the transfer on death deed, to Aulino in February 2008.

{¶45} Yet Aulino denied she had conversations with Chamblin about disinheriting Simon and testified that she did not look closely at the documents Lawler sent to her so she was unaware that the deed to his home had been changed to transfer to her upon death. Aulino testified that she talked with Chamblin at some point in 2008 after he had made changes to the accounts, and Chamblin told her that he would like her to "provide shelter" to Simon. Aulino claims she thought his statement odd, but did not ask Chamblin about it. Aulino denied having any knowledge of the December 2007 and February 2008 transfers, other than the bank account signature change she co-signed. She testified that Chamblin's "provide shelter" comment gave her "the impression that there was something that I may be getting more when he passed away." Aulino also denied having any knowledge of Chamblin's will or the wishes expressed in it.

{¶46} In November 2007 Simon and West divorced and Simon moved to Georgia to live with another man. Testimony and telephone records show that prior to November 2007, West and Aulino did not communicate directly with each other. However, beginning on November 8, 2007 and for the remaining months of November, December, and January, Aulino and West had almost daily telephone conversations, some days multiple conversations. Aulino placed calls to West almost daily during November 2007 talking to him 33 times for a total of 538 minutes. The same pattern continued in December 2007 and January 2008. Aulino testified that she was also talking frequently to her father Chamblin about Simon and West.

**{¶47}** Although Aulino had very frequent conversations with West and Chamblin during this time period, she denied having any knowledge that, according to West, Chamblin travelled from Ohio to Indiana to West's home to discuss Simon. Aulino testified that West had told her that Simon was a drug addict and told her "a lot of disparaging things about my sister." Aulino testified that she encouraged her father to reach out to West to find out what was going on, but she claims she did not know that West would say the same disparaging remarks to him.  Aulino testified that she sided with West and did not talk to Simon during that time period because Aulino "was mad as hell at my sister." But, in May 2008, after the birth of Aulino's daughter, Aulino decided to reach out to Simon. Aulino and Simon had a good, loving relationship from mid-2008 up until their father's last days in February 2016.

**{¶48}** Ed West testified that he told Chamblin that Simon was having an affair with a man in Georgia and had moved there to live with him. West also testified that he told Chamblin about a series of lies Simon had told, such as having cancer, and that Simon had surgeries for the sole purpose to obtain painkillers because she was a drug addict. West also lied to Chamblin about conversations Simon had with her mother -- Chamblin's deceased wife, all of which West later admitted were all lies about Simon. West testified that after he spent approximately three hours talking to Chamblin in this untruthful manner, Chamblin had a tearful breakdown and later called West to inform him he was going to contact his attorney and the bank, to disinherit Simon and remove her from accounts.

**{¶49}** West testified that he encouraged Chamblin to reach out to Aulino about his decision to disinherit Simon. West testified that Chamblin responded that he planned to

talk to Aulino. West testified that although he had filed for divorce from Simon, it was West who attended the 2007 Chamblin family Thanksgiving and Christmas celebrations with Chamblin and Aulino – not Simon. Although West, Chamblin, and Aulino were all together for Thanksgiving and Christmas 2007, and although West and Aulino talked daily, many days multiple times November 2007 through January 2008, both West and Aulino denied discussing with each other Chamblin's decision to disinherit Simon or influencing him in anyway.

{¶50} After February 2008, when Simon had been removed from accounts and assets, telephone calls between West and Aulino abruptly stopped. West left a note for Simon during that same time period that stated, "You'll never know how much I screwed you over in the divorce." West testified that he was just making it up and he wanted Simon to think that he had done something bad to Simon that Simon would not be able to figure out. West denied that "you'll never know how much I screwed you over" referred to West's role in Simon's disinheritance.

{¶51} Cathy Simon testified that at some point after West told the series of lies about her to Chamblin, the record is not clear of the timing, Chamblin contacted Simon and told her that West had said a number of bad things about her that Chamblin wanted clarified. Simon testified that after she talked to Chamblin, she thought her father no longer believed West. Simon testified that she would have no reason to think that her father would have done anything, but she did not know whether her father took any action based on West's lies.

{¶52} The second time period in which Chamblin used a transfer on death directive in favor of Aulino was November 2010. These transfers occurred at a time when

Paula Aulino was very concerned that Chamblin was susceptible to financial manipulation by Dr. Blanton. Aulino testified that Chamblin had told her that he was smitten with Dr. Blanton and if he were younger, Dr. Blanton would be Aulino's stepmother. Aulino testified she had become so concerned with the amount of money her father was spending on Dr. Blanton that she had a talk with Chamblin and told him Dr. Blanton was taking advantage of him.[2] Although Chamblin denied it, he did as Aulino instructed him and ended the relationship with Dr. Blanton. This was also the year Chamblin changed investment accounts to transfer on death to Aulino and transferred management of the investments to Aulino's father-in-law at Wells Fargo in Akron, Ohio. Telephone records show that Aulino spoke to Chamblin the same day he called Wells Fargo but she denies having any involvement in the decision to transfer the account management to her father-in-law and she denies knowledge that Chamblin implemented a transfer on death designation to her. The following year in 2011, Aulino received a gift of $200,000 from Chamblin, which she described as a "grand gesture" to remodel her home.

{¶53} Although the December 2007 - February 2008 and November 2010 transfers effectively left nothing to Simon and everything to Aulino, a number of witnesses testified that this was never Chamblin's intentions. Chamblin's will was not altered and it divided the estate equally between Simon and Aulino. Milton Chamblin and Bryan Swords testified that Chamblin told them both daughters would inherit the furniture store. Simon testified that in the days before he died, she asked Chamblin if he loved her and he replied, "yes" and she asked him if it was his intention that when he dies that he leave

---

[2] Dr. Blanton testified that she had a friendship with Chamblin, she saw him as a father figure not a romantic interest, and that she repaid Chamblin for the work Chamblin paid Throckmorton to perform at her home and medical office.

everything to Aulino and replied "no." Chamblin's medical records from January and February 2016 show that Chamblin told medical professionals that both Simon and Aulino were his health care agents and power of attorneys – as if the changes he made in February 2008 had not occurred or had been reversed.

{¶54} Simon testified that she always had a loving relationship with Chamblin. She introduced copies of birthday cards that Chamblin sent to her starting in 2010 when she was living in Georgia and went up through 2014. Each card had Chamblin's handwritten message expressing love and pride for Simon. Simon testified that when she ended her relationship with the man in Georgia, she had to obtain a restraining order against him because he was violent and had threatened to kill her. Simon testified that after her relationship in Georgia ended, she moved back to Ohio in 2013 and lived with her father for over a year, making dinner for him, working at the furniture store, and attending church every Sunday with him. During that time and up until his death, Simon and Chamblin had a mutually loving, caring father-daughter relationship. Simon introduced text messages between herself and Chamblin that were sent between March 2013 and January 2016 that showed regular, positive, loving communications.

{¶55} Simon testified that she eventually moved out and married her current husband in June 2015. Simon testified that Chamblin and her husband got along and had a mutual admiration for each other as entrepreneurs.

{¶56} Although there was some testimony that it was Simon's divorce and extramarital affair that influenced Chamblin's decision to transfer his assets to Aulino, there was undisputed evidence that both Simon and Aulino were divorced, both had multiple marriages, and both had engaged in extramarital affairs. Aulino testified that

Chamblin had full knowledge of these facts as to both daughters. Thus, the jury could reasonably determine that Chamblin would not use divorces and extramarital affairs as the basis to treat one daughter differently in his estate planning.

**{¶57}** Aulino testified that after Simon sued her, Aulino contacted Simon's violent and dangerous ex-boyfriend in Georgia and told him that Simon was living in Youngstown, Ohio. Aulino testified that after she informed the ex-boyfriend of Simon's whereabouts, he contacted Simon.

**{¶58}** Sufficient evidence exists to support the jury's verdict that Aulino exerted undue influence over Chamblin, which caused him to execute the transfers on death to her on the assets at issue. Issues of undue influence, by their nature, are generally proven through indirect circumstantial evidence and inference drawn from a wide scope of facts. Here the evidence of Chamblin's age and mental state during both time periods, his love and value of family and forgiveness, his pride in and love for Simon, the conversations he had with others, the provisions of his will, the timing, frequency and intensity of West and Aulino's conversations with Chamblin in late 2007 to early 2008, which included inflammatory lies about Simon, the influence Aulino exerted over him in 2010 to cause him to terminate his beloved friendship with Dr. Blanton and transfer his investment accounts, and her ability to procure a sizable $200,000 gift from Chamblin in 2011, are all factors for the jury's consideration. It is the duty of the jury to draw reasonable inferences after considering all the circumstances. The jury is free to disbelieve much of Aulino's and her witnesses' testimony and reasonably infer from the circumstances that Aulino used West, West's lies, and Chamblin's emotional breakdown as a result of West's lies, to exercise undue influence over Chamblin and cause him to make the transfers to

her at a time when she was "as mad as hell" at Simon and no longer speaking to her. The jury can believe witnesses who testified that Chamblin was not a spiteful, vengeful father, who secretly harbored an intense grudge, but a loving, proud and forgiving father, and that the transfers were the result of the undue influence of a mad-as-hell sister.

**{¶59}** The jury is also free to disbelieve Aulino when she claimed a complete lack of knowledge over matters related to her father's estate plans and the 2010 transfer on death directive. The jury heard testimony that Aulino was very concerned about her father's new romantic involvement with Dr. Blanton – wanted to call an intervention – and how the relationship was negatively affecting his finances. Chamblin's generous spending on Dr. Blanton would decrease Aulino's inheritance. And if Chamblin were to marry Dr. Blanton and make her Aulino's stepmother as he had previously suggested, it could have serious ramifications on Aulino's inheritance. The timing of Aulino's influence over Chamblin to end the relationship with Dr. Blanton (an action that other witnesses testified Chamblin did not want to do) matched with the transfer of the management of several of Chamblin's retirement accounts to Aulino's father-in-law and the transfer on death directive to Aulino. The jury could infer that Aulino exercised undue influence over Chamblin, a man she firmly believed was susceptible to financial exploitation, to execute transfer on death directives to her as a means of diverting the funds away from Dr. Blanton's realm of influence and securing them exclusively for herself. The jury was free to disbelieve her when she denied having discussions about the transfer on death directives where the phone records showed she spoke to Chamblin the same day he made them.

**{¶60}** Taken as a whole, the circumstantial evidence supports a rational inference that the conveyances to Aulino were the result of her undue influence upon Chamblin. The evidence, when construed most strongly in favor of Simon, is legally sufficient to sustain the verdict.

### C. Promissory Estoppel

**{¶61}** Also as part of her first two assignments of error, Aulino argues that there was no evidence to support the jury's finding that Aulino is liable to Simon for promissory estoppel because there is no evidence that Simon relied on Aulino's promise to give half of the assets she acquired at Chamblin's death to Simon.

**{¶62}** Promissory estoppel is a quasicontractual or equitable doctrine. *See Worthington v. Speedway SuperAmerica L.L.C.*, 4th Dist. Scioto No. 04CA2938, 2004-Ohio-5077. The elements of promissory estoppel require "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *McCroskey v. State*, 8 Ohio St.3d 29, 30, 456 N.E.2d 1204 (1983), citing Restatement of the Law, Contracts 2d (1973), Section 90. In order to prevail on a claim of promissory estoppel, plaintiff must show a clear and unambiguous promise and reliance by the party to whom the promise is made. The reliance must be reasonable and foreseeable, and the party relying on the promise must have been injured by the reliance. *See Doe v. Adkins*, 110 Ohio App.3d 427, 437, 674 N.E.2d 731 (4th Dist. 1996), citing *Healey v. Republic Powdered Metals, Inc.*, 85 Ohio App.3d 281, 284, 619 N.E.2d 1035 (9th Dist. 1992). A promise is defined as "a manifestation of intention to act or refrain from acting in a specified way, so made as to

justify a promisee in understanding that a commitment has been made." *Stull v. Combustion Engineering, Inc.*, 72 Ohio App.3d 553, 557, 595 N.E.2d 504 (3d Dist. 1991), citing Restatement of the Law, Contracts 2d (1981) 8, Section 2(1). Furthermore, the party who asserts the promissory-estoppel claim bears the burden to prove by clear and convincing evidence all the elements of the claim. *In re Estate of Popov,* 4th Dist. Lawrence No. 02CA26, 2003-Ohio-4556, ¶ 30. Whether a defendant made "a clear and unambiguous promise" is a question of fact. *See, e.g., McCroskey, supra; see also Miller v. Lindsay–Green, Inc.*, 10th Dist. Franklin. No. 04AP–848, 2005-Ohio-6366; *Dailey v. Craigmyle & Son Farms, L.L.C.*, 177 Ohio App.3d 439, 2008-Ohio-4034, 894 N.E.2d 1301, ¶ 14 (4th Dist.).

**{¶63}** Here, Aulino indisputably made an oral promise to give Simon half of the assets she acquired when Chamblin died. Aulino testified that she told Simon on February 18 and again on February 20, 2016 that she would give her sister half of the assets. Aulino testified she expected Simon to rely on her word, "I meant it when I said it."

**{¶64}** Simon contends that she relied on the promise by Aulino, because if Aulino had not made the promises, she would have continued to seek legal solutions from John Lawler, her father's attorney. When asked whether she believed prior to her father's death that Aulino was not going to give her half or honor the promise, Simon testified "I didn't know. I had to trust that she would." Simon testified that she first learned of an issue with Chamblin's estate on February 14, 2016, she learned of certain transfer on death directives on February 16, and then on February 18 learned of her removal from Chamblin Furniture Co. bank accounts. Simon testified that she contacted Lawler to inquire. Simon said she asked Aulino about the unexpected changes to Chamblin's estate and Aulino

hugged Simon, they sat on the couch together and talked, and Aulino told her that it was to protect Simon and to keep it out of probate. Simon testified that she held Aulino in high regard and thought Aulino loved her; they had a vacation planned for February 2016 that they would have taken together had their father not become ill. Simon trusted Aulino to honor her promise.

**{¶65}** Lawler testified that both Aulino and Simon called him during the last weeks of Chamblin's life. Aulino initially called him February 9, 10, 15, and 16, 2016 in reference to Chamblin being in the James Hospital and the house deed. Lawler testified that he received two calls from Simon, one February 16 concerning the house deed and one February 17 concerning the corporate shares. Lawler testified that he told both women, "This is not the time to talk about this. Your father's in the hospital dying." Aulino also testified that Lawler told her repeatedly to focus on her father, not the estate, because they could work on estate matters after Chamblin dies. Lawler had no evidence in his file of any additional phone calls from Simon after February 17, but he received another phone call from Aulino on February 19 in which Aulino was asking about reversing the transfer on death designations. Chamblin died on February 21, 2016.

**{¶66}** Simon argues that the evidence shows she contacted Lawler to understand what happened with her father's estate and to learn how it could be corrected. However, after Aulino promised to give half of the assets she acquired from Chamblin's death to her, Simon relied on that promise, forbearing further action, and made no other calls to Lawler. She contends she stopped seeking answers from Lawler because she relied on her sister's promise and ultimately believed Aulino would do the right thing.

**{¶67}** Aulino contends that a text message Simon sent shows she did not rely on Aulino's promise. Simon texted, "You answered as I thought you would but was holding out hope that you would do the right thing. You never had any intentions of making this matter right." However, a full review of the text and Simon's testimony, makes clear that the text refers to Simon's request that Aulino use her power of attorney while Chamblin was alive to change the transfer on death directives so that (1) both sisters are on them or (2) they are revoked. Simon said the text did not refer to Aulino's promise to split the assets after Chamblin's death.

**{¶68}** The record shows that Simon was seeking answers to two different questions: (1) why her father took the actions he did concerning the assets, and (2) how to change the transfers before Chamblin died so that Chamblin's estate would pass equally to both Simon and Aulino upon his death as provided for in the will. Aulino argues that Simon did not rely on her promise because Simon testified that she would not have done anything different had Aulino not made the promise. Aulino relies on a hypothetical question asked of Simon on cross-examination:

> Q. * * * At the hospital Paula says, I'll give you half, told the jury that. If Paula said, I'm not going to give you half, would you have done anything different before your dad passed away?
>
> A. Gosh, that's a good question. I would have continued to ask for answers. So, no, I guess I wouldn't have done anything different. I didn't understand what was happening. I was blind-sided.

**{¶69}** Simon's response to this hypothetical is confusing and subject to several interpretations. She states she would have continued to ask for answers, but then states she would not have done anything different. The jury could infer from this response that Simon would have continued to search for answers as to *why* her father took the steps

he did, particularly because she immediately states she "didn't understand what was happening" and was "blind-sided." Aulino's promise to split the assets would not stop Simon from searching for answers as to *why* Chamblin's estate plans changed in such an unexpected and drastic manner. Rather Aulino's promise was made and relied upon by Simon so that she stopped communicating with Lawler to find legal methods to reverse the transfers prior to Chamblin's death. There is evidence in the record that after Aulino reassured Simon that she would split the assets with Simon, Simon decided to focus on her father and stopped communicating with Lawler about the estate.

**{¶70}** We find the jury's determination that Aulino was liable to Simon under promissory estoppel was supported by sufficient evidence. The evidence, when construed most strongly in favor of Simon, is legally sufficient to sustain the verdict.

### D. Breach of Oral Trust

**{¶71}** As part of her first two assignments of error, Aulino contends that the jury willfully ignored the jury instructions because it found that Aulino "as trustee breached her fiduciary duty under an oral trust to Ms. Simon" but also found that Chamblin did not create a trust over Simon's share of the assets. Aulino argues that there was no evidence that an oral trust was created and no evidence that she breached her duty as trustee.

**{¶72}** Aulino did not object to the jury's interrogatory responses as inconsistent at trial. Generally, a party must bring alleged inconsistencies in jury interrogatories to the trial court's attention before the jury is discharged. *See Bicudo v. Lexford Properties, Inc.*, 157 Ohio App.3d 509, 2004–Ohio–3202, 812 N.E.2d 315 (7th Dist.); *Avondet v. Blankstein*, 118 Ohio App.3d 357, 368, 692 N.E.2d 1063 (8th Dist.1997). Otherwise, the party waives the issue for appellate review. *Bicudo, supra; Chesney v. Jowers*, 8th Dist.

Cuyahoga No. 82270, 2003–Ohio–6614 (stating that by failing to object to the alleged inconsistency before the jury was discharged and instead raising the argument in a JNOV motion resulted in a waiver). The policy reasons behind the rule are "(1) to promote the efficiency of trials by permitting the reconciliation of inconsistencies without the need for a new presentation of evidence to a different trier of fact, and (2) to prevent jury shopping by litigants who might wait to object to an inconsistency until after the original jury is discharged." *Greynolds v. Kurman*, 91 Ohio App.3d 389, 395, 632 N.E.2d 946 (9th Dist. 1993); *Wright v. Suzuki Motor Corp.,* 4th Dist. Meigs No. 03CA2, 2005-Ohio-3494, ¶ 131. "An appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State v. Williams*, 51 Ohio St.2d 112, 364 N.E.2d 1364, (1977) paragraph one of the syllabus.

**{¶73}** Additionally, we find sufficient evidence exists to support the jury's general verdict under either of Simon's two other alternative legal claims, interference with inheritance expectancy and promissory estoppel, either of which entitled Simon to an award of half of Chamblin's assets. Aulino's other argument in support of these two assignments of error– that there was no oral trust over half of the estate and that she did not breach her duty as trustee—are moot given our prior determinations. *Hamilton v. Ball*, 2014-Ohio-1118, 7 N.E.3d 1241, fn. 4 (4th Dist.) (given prior discussion, alternative arguments supporting an assignment of error were moot).

**{¶74}** Even if we were to find that this issue was not waived, we can reconcile the jury's interrogatory responses with the instructions given them.  The jury was instructed on both constructive trusts and oral trusts. The instructions for oral trust stated, "The

creation of a trust[.] [T]o create an oral trust, testator must have, one, intended to create the trust; two, stated the identity of a trustee; three, stated the definite property or assets to be included in the trust; and, four, stated the persons to receive the assets included in the trust. Because the jury found Aulino liable to Simon for promissory estoppel (i.e. that Aulino's orally promised to give half of her inheritance to Simon), which was Interrogatory No. 2, the jury could have found that Aulino created an oral trust when she promised to convey half of the assets to Simon. The jury could have found that Aulino breached her fiduciary duty under this oral trust when she failed to convey half of the inheritance to Simon, which was the question posed in Interrogatory No. 3.The interrogatory about a breach of an oral trust was inserted into the interrogatories before any interrogatory concerning Chamblin's creation of a trust. In other words, the order in which these interrogatories were presented to the jury could have influenced their understanding of how to interpret and apply the instructions on oral trusts and allows us to reconcile the responses.

{¶75} We find sufficient evidence to support the jury's finding of liability under either a claim of intentional interference with expectancy of inheritance or a claim of promissory estoppel and overrule Aulino's first and second assignments of error. The evidence, when construed most strongly in favor of Simon, is legally sufficient to sustain the verdict. The jury verdict is supported by some competent, credible evidence going to each essential element of the case and thus is not against the manifest weight of the evidence.

E. Trial Counsel Misconduct

**{¶76}** For her third assignment of error, Aulino contends that the jury verdict should be overturned due to Simon's counsel's misconduct.  Aulino argues that Simon's counsel misstated the evidence in his closing argument, mischaracterized Aulino as an uncaring, wealthy woman, and asked questions from witnesses about the furniture store's closing "with the desired effect to play to a Jury in a town which has lost many jobs."

**{¶77}** First, we note that Aulino did not object to any of Simon's counsel's statements or the questions she contends engaged the jury's passion and prejudice and she did not ask the trial court for a new trial under Civ.R. 59(A)(2), governing attorney misconduct. Additionally, the trial court instructed the jury that trial counsels' closing arguments were not evidence, which raises the presumption that the jury followed the instructions. *Berry* at ¶ 34.

**{¶78}** Because Aulino failed to object to the questions and the closing argument, as she concedes on appeal, she has forfeited all but plain error. *See State v. Neal*, 2016–Ohio–64, 57 N.E.2d 272, ¶ 36 (4th Dist.) (failure to object to testimony and closing argument at trial forfeited all but plain error on appeal). In addition, "[a]n appellate court 'must proceed with the utmost caution' in applying the doctrine of plain error in a civil case." *Risner v. Ohio Dept. of Natural Resources, Ohio Div. of Wildlife*, 144 Ohio St.3d 278, 2015–Ohio–3731, 42 N.E.2d 718, ¶ 27*,* quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997). "Plain error should be strictly limited 'to the *extremely rare* case involving *exceptional* circumstances when the error, left unobjected to at the trial court, rises to the level of challenging the legitimacy of the underlying judicial process

itself.' " (Emphasis sic.) *Risner* at ¶ 27, quoting *Goldfuss*, at 122; *Berry v. Paint Valley Supply, LLC, et al.*, 4th Dist. Highland No. 16CA19, 2017-Ohio-4254, ¶ 29-30.

**{¶79}** Here none of the questions Aulino references or the statements in closing argument call into question the basic integrity of the judicial system. For example, Aulino argues that Simon's counsel's statement in closing argument that Chamblin's health conditions "*affected* him every day" (emphasis sic) was not supported by any evidence and misled the jury into an erroneous finding that Chamblin was susceptible to undue influence. Yet Chamblin's family doctor, Dr. Parrott, testified that Chamblin had renal cancer (kidney cancer), had one of his kidneys removed, and had to be monitored very closely by his oncologist with routine CAT scans. Dr. Parrott also testified that Chamblin had a history of prostate cancer, had his prostate removed, had Non-Hodgkin's lymphoma (cancer of the lymph node glands), had thyroid cancer, had to be continually monitored for cancer reoccurrence, suffered from neuropathy (stinging, burning, or numbness of the extremities), had chronic kidney disease, high blood pressure, and was a diabetic who had to watch his diet very carefully. Dr. Parrott testified that Chamblin's creatine levels were elevated in early 2008, which was a concern that his kidney disease might be worsening. In closing argument, Simon's counsel stated that Chamblin "dealt with significant medical challenges" and summarized, "Dr. Parrott came in today and told us whether it was the removal of his kidney he knew about, the hypothyroidism he knew that he had, the non-Hodgkin's lymphoma that he dealt with, it was something that affected him every day." We find nothing improper about counsel's statement that the significant medical challenges Chamblin experienced affected him daily.

**{¶80}** Nonetheless, Aulino contends that the trial court was required to intervene sua sponte to admonish counsel and to take curative action to nullify the effects of counsel's questions and comments. We have reviewed the entire trial transcript and can find no conduct that would require the trial court's sua sponte intervention. To the contrary, the record supports the trial court's commendation of both parties' attorneys during the multi-day trial at several times toward the end of the proceedings:

> I will say I would be remiss if I did not say to Ms. Simon and Ms. Aulino, you have been so well represented * * *. This has been spectacular how you have been represented. They as well.
>
> But I just wanted you both to hear * * * I don't send out flowery messages unless I believe them. And I've been impressed, counselors.
>
> I was able to say personally to both Ms. Simon and Ms. Aulino * * * I want to thank you for the courtesy that each of you have extended to the Court and the Court staff. And, again, I renew my belief, my firm belief, without hesitation and reservation, that both – Ms. Simon, both you and Ms. Aulino were exceptionally well represented in this Court. Thank you.

**{¶81}** Under these circumstances we find that this is not one of the extremely rare civil cases in which plain error challenging the legitimacy of the underlying judicial process itself occurred. We overrule Aulino's third assignment of error.

## IV. LEGAL ANALYSIS OF SIMON'S CROSS APPEAL

**{¶82}** The jury awarded Simon $330,693 in compensatory damages, zero punitive damages, and stated it would award attorney fees. Simon filed a post-trial motion for a new trial on damages only, or alternatively, an additur, or alternatively a motion for judgment notwithstanding the verdict on damages. The trial court denied the motion in a well-reasoned decision. Simon cross-appealed.

**{¶83}** She raises two assignments of error for review. First, she contends the trial court erred in denying her motion for a new trial on damages under Civ.R. 59(A)(4)

(inadequate), (5) (too small), (6) (against the manifest weight of the evidence), and (9) (trial court made an error of law during trial that affected the damages calculation). Second, she contends the trial court erred in denying her motion for judgment notwithstanding the verdict on damages under Civ.R. 50(B).

A. Simon's Motion for a New Trial on Damages under Civ.R. 59(A)

1. Standard of Review

**{¶84}** The relevant provisions of Civ.R. 59(A) provide:

> A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds: (1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial; * * * (4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice; (5) Error in the amount of recovery, whether too large or too small, when the action is upon a contract or for the injury or detention of property; (6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case; * * * (9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application.

**{¶85}** The standard of review for a motion for a new trial under Civ.R. 59(A) depends upon the basis for the motion. Where a trial court is authorized to grant a new trial for a reason which requires the exercise of sound discretion, the order granting a new trial may be reversed only upon a showing of abuse of discretion by the trial court. Where a new trial is granted or denied by a trial court for reasons which involve no exercise of discretion, but only a decision on a question of law, we apply a de novo standard of review and reverse if the decision was erroneous as a matter of law. *Rohde v. Farmer*, 23 Ohio St.2d 82, 83, 262 N.E.2d 685, 686 (1970), paragraphs one and two of the syllabus. Orders denying or granting motions for new trial under Civ.R. 59(A)(1), (4), (5) and (6) are reviewed under abuse of discretion standard. *Lewis v. Nease,* 4th Dist. Scioto No.

05CA3025, 2006-Ohio-4362, ¶ 73 (reviewing Civ.R. 59(A)(1), (3) and (6) motions for "abuse of discretion," which connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable); *Torres v. Concrete Designs Inc.*, 8th Dist. Cuyahoga No. 105833, 2019-Ohio-1342, ¶ 14 (motions for new trial under Civ.R. 59(A)(4) are reviewed for "abuse of discretion"); *KB Resources, LLC v. Patriot Energy Partners, LLC*, 2018-Ohio-2771, 116 N.E.3d 728, ¶ 113 (7th Dist.) (the standard of appellate review of an order on a Civ.R. 59(A)(6) motion is abuse of discretion); *Prince v. Jordan*, 9th Dist. Lorain No. CIV.A. 04CA008423, 2004-Ohio-7184, ¶ 20 (order denying or granting motion for new trial under Civ.R. 59(A)(4) and (5) reviewed for abuse of discretion).

**{¶86}** Civ.R. 59(A)(9) provides that the trial court may grant a new trial based upon "[e]rror of law occurring at the trial and brought to the attention of the trial court." Appellate review of a Civ.R. 59(A)(9) motion is de novo, rather than under an abuse-of-discretion standard. *Wright v. Suzuki Motor Corp.*, 4th Dist. Meigs No. 03CA2, 2005-Ohio-3494, ¶ 128. However, here Simon contends the trial court erred in excluding evidence. The admission or exclusion of relevant evidence is a matter entrusted to the sound discretion of a trial court and its decision will not be reversed absent an abuse of that discretion. We note that an abuse of discretion is more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Tolliver v. Braglin*, 4th Dist. Athens No. 03CA18, 2004-Ohio-731, ¶ 11.

2. Grounds for New Trial under Civ.R. 59(A)(4), (5), and (6)

**{¶87}** Simon contends that the following exhibits admitted at trial identified the assets Aulino received at Chamblin's death and thus, unequivocally established her

damages: (1) Wells Fargo Account No. ****-0905 with "FCC as custodian" valued at $49,525.61 as of Jan 31, 2016; (2) Wells Fargo Account No. ****-8691 with a "TOD registration" and a mutual fund line item valued at $143,777.46 as of Jan 31, 2016; (3) Jackson National Life Insurance check to Aulino in the sum of $416,270.64; (4) real estate purchase contract for Chamblin's residence with an agreed purchase price of $145,000; (5) Chamblin Furniture Co. First State Bank Account with a balance of $150,061.09 on Feb. 29, 2016; Chamblin Furniture Co. corporate balance sheet dated March 31, 2016; Chamblin Furniture Co. Fifth Third Bank Account with a beginning balance of $245,011.56 as of Feb. 1, 2016.

{¶88} First, as the trial court explained in its decision, there was very little testimony concerning Simon's damages. The parties stipulated to the admissibility of the exhibits, but did not stipulate that these constituted Simon's compensatory damages. Although Simon's counsel argued for a damage award of $778,563 in his closing, closing arguments are not evidence. Very little evidentiary guidance was given to the jury. The trial court accurately described the record in its decision denying Simon's motion:

> Both counsel stipulated to these exhibits being admitted into evidence. There was no stipulation on how the exhibits would be interpreted, whether they were corporate or personal assets, or anything else – other than words printed on pieces of paper themselves. There was little, if any testimony offered at trial to assist the Jury in assessing these exhibits. The Jury was left to determine, as with all evidence, each exhibit's relevance and value during their deliberations.

{¶89} Second, Simon's argument is flawed because she includes corporate assets, which are not Chamblin's personal assets. Chamblin Furniture Co. is a corporation with shareholders. All of the corporate assets are owned by Chamblin Furniture Co., not Wayne Chamblin. Therefore, Aulino received none of those assets at

Chamblin's death. Instead, Aulino received some shares in Chamblin Furniture Co., but it is unclear how many shares Aulino received. According to Lawler's testimony, Chamblin "did change shares of the corporation to make them transfer on death to [Aulino] as well." However, it is unknown how many shares Aulino received by the transfer on death directive. As the trial court aptly noted, "Testimony was remarkably unclear as to the number of shares and ownership of the stock in the company." The corporate minute book contained an entry that stated that upon Chamblin's wife's death in 2003, her shares were divided equally between Simon and Aulino. Based on this, the jury could have determined that Aulino and Simon already each owned 25% shares in the corporation and Aulino received an additional 50% of the shares at Chamblin's death.

**{¶90}** Even if the jury could make an accurate determination about the number of shares passing to Aulino through the transfer on death directive, the jury would not be able to determine the value of those shares. No testimony was given concerning the value of the corporate shares in Chamblin Furniture Co., which was not a publicly traded corporation, but a family-owned, privately held corporation. Additionally, Chamblin Furniture was out of business. It is possible the jury assigned a zero value to the shares when calculating damages. The corporate bank accounts balances and the corporate balance sheet in no way translate into a share valuation. As Aulino argues in her response brief, valuation of stock is a complicated matter generally outside the knowledge of the jury. *Tolkes & Son, Inc. v. Midwestern Indemn.* Co., 65 Ohio St.3d 621, 605 N.E.2d 936 (1992), paragraph one of the syllabus ("It is a general rule of evidence that before one may testify as to his opinion on the value of property, one must qualify as an expert."); *see also Armstrong v. Marathon Oil Co.,* 32 Ohio St.3d 397, 411, 513 N.E.2d 776, 789

(1987) (To determine "the value of closely held stock in privately or closely held corporations, which stock has little, or no, over-the-counter trading activity * * * the trial court and the appraisers would have no analysis of market activity to apply. Under such circumstances, they may well apply the so-called hypothetical market valuations * * *."); *see also Raymond v. Raymond,* 10th Dist. Franklin No. 11AP-363, 2011-Ohio-6173, *6 ("A non-expert owner, although he may have knowledge of the unique characteristics of his property, 'is not an expert who can assimilate various asking prices of other similar property and render an unbiased, so-called 'expert' opinion as to the value of his property based upon these other figures.' ").

**{¶91}** This leaves only the two Wells Fargo accounts, the real estate contract, and the life insurance proceeds for the jury to consider. We note that of the two Wells Fargo accounts, only the account ending in "8691" contains the notation "TOD restriction." The Wells Fargo account ending "0905" indicates "FCC as Custodian" instead of "TOD restriction." Additionally, the Wells Fargo transfer on death directive is for the Wells Fargo account ending "8691" – there is no similar transfer on death directive in the record for Wells Fargo account ending "0905." There was no testimony to explain this difference. The jury could have determined that only the Wells Fargo account ending "8691" had a transfer on death directive and therefore, it was the only account that went solely to Aulino at Chamblin's death. The jury could have determined that the other Wells Fargo account ending 0905 went to Simon and Aulino equally and excluded it from their damage calculations. To add to the confusion, the total value of the Wells Fargo account with the TOD restriction as of Jan. 31, 2016 was $442,733.12, but Simon contends that only the

mutual fund line item of the account is relevant to her damages, which was $143,777.46.[3] Half of that is $71,888.73.

**{¶92}** The real estate contract for the sale of Chamblin's home has a purchase price of $145,000 but it also contains a provision that states that Aulino agrees to pay the real estate agent a 5% commission. There was no testimony or real estate closing documents to show that this sale occurred, nor was there evidence of how much may have been deducted from the purchase price to pay any lienholders, real estate taxes, or other closing costs. Without evidence of these other costs, the jury could have reasonably reduced the purchase price by 5%, which leaves a net purchase price of $137,750. Half of that is $68,875. The life insurance proceeds Aulino received totaled $416,270.64, half is $208,135.32. The total sum of half of the mutual fund, the home, and the life insurance proceeds is $348,899.05; the jury awarded $330,693 – a 5.5% variance.

**{¶93}** Based on our review of the record, the jury did not lose its way. The compensatory damage award is not against the manifest weight of the evidence, nor is it too small or inadequate. The trial court did not abuse its discretion in denying Simon's motion for a new trial under Civ.R. 59(A)(4),(5), or (6).

3. Ground for New Trial under Civ.R. 59(A)(9)

**{¶94}** Next Simon contends that the trial court erred in excluding a real estate appraisal of Chamblin Furniture Co.'s corporate real estate holdings. She argues that Chamblin Furniture's real estate transferred to Aulino at Chamblin's death and half the

---

[3] Simon's attorney argued in closing, "Exhibit X is the mutual fund, $143,777.46" and both of Simon's briefs identify the mutual fund account value as $143,777.46. There was no testimony as to why the entire $442,733.12 is not included. It is also unclear why Simon chose the Jan. 31, 2016 date to determine value. We note that the trial court used the February 29, 2016 date and the entire $444,734.67 when working its way through the numbers. See Judgment Entry on Post Trial Motions, p. 4.

value of it should have been included in the jury's compensatory damage calculation. There is nothing in the record to support this contention. For the reasons previously discussed, Chamblin Furniture Co.'s assets are not relevant to Simon's damage calculation. Additionally, without the appraiser present to testify, the appraisal report is inadmissible hearsay. *See Marquez v. Jackson*, 2018-Ohio-346, 105 N.E.3d 517, ¶ 25 (9th Dist.) (plaintiff was prevented from having fair trial by admission into evidence of defendant's expert witness report where expert did not testify at trial and thus report was inadmissible hearsay); *see also Ullmann v. Duffus*, 10th Dist. Franklin No. 05AP-299, 2005-Ohio-6060, ¶ 23.

**{¶95}** The trial court did not abuse its discretion when it excluded the real estate appraisal of Chamblin Furniture Co.'s real estate assets and denied Simon's motion for a new trial under Civ.R. 59(A)(9).

### 4. Ground for New Trial under Civ.R. 59(A)(1)

**{¶96}** Simon contends she is entitled to a new trial on punitive damages because the jury verdict demonstrates confusion in either the jury instructions or the interrogatories. Interrogatory No. 6 asks, "In addition to actual damages, should punitive damages be awarded to Ms. Simon?" The jury circled "No." Though the jury awarded no punitive damages, it responded "yes" when asked if it would award attorney fees. She contends that the instructions and interrogatories were clear that the jury could only find Aulino liable for attorney fees if it found her liable for punitive damages.

**{¶97}** The record shows that the trial court and counsel recognized the inconsistency at the time the jury verdict was rendered and decided to send the jury back into the jury room to confirm its response to Interrogatory No. 6 – that it did not want to

award punitive damages. If the jury confirmed that it did not want to award punitive damages then the trial court stated that it would as a legal ruling clear up the inconsistency:

> [T]here's a potential inconsistency and I need you to - - I want to send back interrogatory number 6 with you to ensure that it is your determination and, if so, that's fine. That will clear up any inconsistencies. Okay? So I'll return you back to the jury room and let you ensure through discussion that it is correct and that will clear up any - - any if it's not correct, you can advise us of that as well.

{¶98}  Neither counsel objected to this procedure. Simon's attorney confirmed his understanding of the process and acquiesced.   However, after the jury did not return within 30 minutes, counsel and the court became concerned the jury was redeliberating punitive damages. The trial court called the jury back and gave them additional instructions and again, neither counsel objected to this procedure:

> [T]here's some concern that the directive that I requested was only to confirm whether that was, in fact, your decision on interrogatory number 6. There's some concern that it was, that maybe you were led to believe that I wanted you to go back and reconsider that decision. I was just asking is that – was that, in fact, your decision, and if it was, that's fine. If you – if it was not your decision, then we need to hear from  - - in that respect. Does that make sense to you?

{¶99}  The jury returned and confirmed that they did not want to award punitive damages. No objections were made by either counsel and the jury was excused. Based on having confirmed with the jury that it did not award punitive damages, the trial court disregarded the jury's interrogatory response concerning the award of attorney fees and enter a judgment in Simon's favor for $330,693, plus costs and post-judgment interest.

{¶100}  Because Simon did not object to the inconsistencies or to the trial court's procedure for resolving the inconsistencies while the jury was impaneled, it is waived. The Supreme Court of Ohio has recognized that an objection to inconsistent answers to jury interrogatories is  waived  unless  the  party  raises  it  before  the jury is

discharged. *O'Connell v. Chesapeake & Ohio R. Co.*, 58 Ohio St.3d 226, 229, 569 N.E.2d 889 (1991). This rule recognizes that a court can only exercise the full range of available remedies while the jury is still impaneled. *Shoemaker v. Crawford*, 78 Ohio App.3d 53, 61, 603 N.E.2d 1114 (10th Dist. 1991). This rule 'promotes trial efficiency by permitting reconciliation of inconsistencies without the need for a new presentation of the evidence to a different jury and it prevents jury shopping by litigants who wait to voice their objections to inconsistencies until after the original jury is discharged. *O'Connell* at 229; *Lewis v. Nease*, 4th Dist. Scioto No. 05CA3025, 2006-Ohio-4362, ¶ 35.

{¶101} The trial court did not abuse its discretion when it denied Simon's motion for a new trial under Civ.R. 59(A)(9). Because we find that the trial court did not abuse its discretion in denying Simon's motion for a new trial under any of the grounds she raised under Civ.R. 59(A), we overrule Simon's first assignment of error.

B. Simon's Motion for Judgment Notwithstanding the Verdict under Civ.R. 50(B)

{¶102} Simon contends she is entitled to a new trial on damages because "Reasonable minds can come to but one conclusion on damages – Ms. Simon is entitled to $778,653.00." We reject this argument for the reasons set forth in our analysis of her first assignment of error.

{¶103} Simon also contends she is entitled to a new trial on damages because Aulino acted with ill will, a spirit of revenge, and malice when she contacted Simon's violent ex-boyfriend in Georgia after Simon filed her complaint. Simon contends that Aulino offered no evidence to dispute that she reached out in this manner to secure a dismissal of her case. However, Aulino's contact with Simon's ex-boyfriend, however indicative of her character, occurred after the lawsuit was filed. Under Ohio law, the

general rule is that punitive damages may only be recovered in actions involving intentional torts and arise from the causes of action set forth in the complaint. *Digital & Analog Design Corp. v. N. Supply Co.*, 44 Ohio St.3d 36, 47, 540 N.E.2d 1358 (1989) (court found that tortious activity for which a punitive damages award may be sustained occurred in only three of the four counts and that the tortious activity arose from a single animus, thus the defendant could only be punished by only a single punitive damages award); *Dodson v. Maines,* 6th Dist. Sandusky No. S-11-012, 2012-Ohio-2548, ¶ 37.

{¶104}  We overrule Simon's second assignment of error.

V. CONCLUSION

{¶105}  The trial court did not err when it denied Aulino's motion for a directed verdict and for a judgment notwithstanding the verdict. Construing the evidence most strongly in favor of Simon, we find sufficient evidence to support the jury's verdict in favor of Simon. The trial court did not abuse its discretion when it denied Simon's motion for a new trial and for a judgment notwithstanding the verdict as to damages. The jury's award of damages is not against the manifest weight of the evidence, nor too small or inadequate. We affirm the judgment of the trial court.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Adams County Court of Common Pleas to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
Michael D. Hess, Judge



**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**