[Cite as *Adams v. Morningstar*, 2022-Ohio-918.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PICKAWAY COUNTY

| | | |
|---|---|---|
| Bret Adams, | : | Case No. 21CA5 |
| Plaintiff-Appellant, | : | |
| v. | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| Amie Morningstar, | : | |
| Defendant-Appellee. | : | **RELEASED 3/22/2022** |

_____

<u>APPEARANCES</u>:

Barton R. Keyes, Cooper & Elliott, LLC, Columbus, Ohio, for appellant.

David A. Ison, Powell, Ohio, for appellee.

_____

Hess, J.

{¶1}   Bret Adams appeals from a judgment of the Pickaway County Court of Common Pleas imposing sanctions against him for frivolous conduct under R.C. 2323.51. Contrary to what Adams asserts in his sole assignment of error, the trial court correctly found that he engaged in frivolous conduct with respect to his breach of contract and promissory estoppel claims against Amie Morningstar.  Accordingly, we overrule the assignment of error and affirm the trial court's judgment.

## I.  FACTS AND PROCEDURAL HISTORY

{¶2}   In April 2019, Adams filed a complaint against Morningstar for breach of contract and promissory estoppel, which he later amended. The amended complaint alleged the following.  In 2015, in his capacity as an active attorney, Adams met with Morningstar about a potential case she had against her employer.  He referred the matter to attorney Brian Duncan, who accepted the representation after agreeing to pay Adams

a referral fee.  Adams remained involved in the matter "by participating in the investigation of claims, reviewing pleadings and maintain [sic] active communication with [Morningstar] and Attorney Duncan."  In August 2018, a jury awarded Morningstar $3.4 million, which was reduced to $1.5 million in a post-trial mediation.  In November 2018, Adams and Morningstar had dinner "to discuss payment of the referral fee," and she "agreed to honor the referral agreement and verbally guaranteed payment of $100,000 to [Adams]."  At a subsequent meeting, Morningstar approved an email to Greg Barwell, the attorney "who mediated the settlement agreement," authorizing him "to withhold distribution of $100,000" and directing that "payment be made to [Adams]."  Morningstar "again verbally offered to pay [Adams] the $100,000, but [he] declined, relying on [Morningstar's] direction that the fee be paid from settlement proceeds." Based on Morningstar's "promises of payment," Adams advanced funds for the construction of a home. In February 2019, Duncan told Adams the settlement proceeds had been distributed, and he "would not be receiving his fee."  Morningstar caused Adams $100,000 in damages under breach of contract and promissory estoppel theories.  She also injured him by engaging in frivolous conduct under R.C. 2323.51 after he filed the initial complaint.

{¶3}    Morningstar filed an answer to the amended complaint and counterclaims for fraud and tortious interference with a contractual relationship.  Subsequently, the court decided it would not hear Adams's frivolous conduct claim "during the trial on the merits" but would instead conduct a R.C. 2323.51 hearing after it rendered judgment on the other claims.  The court informed the parties that they could file additional R.C. 2323.51 claims within 30 days of the final judgment.

{¶4} Morningstar moved for summary judgment on Adams's other claims, relying on matters deemed admitted under Civ.R. 36 due to Adams's failure to timely respond to her request for admissions. The court allowed Adams to withdraw the admissions, and he responded to Morningstar's discovery requests. The responses indicate that contrary to what Adams alleged in the amended complaint, he did not participate as counsel for Morningstar in her employment case and never personally communicated with her until after that case had concluded. In response to inquiries about Morningstar's alleged promise, Adams indicated she agreed to ask Barwell to release funds for the referral fee from her settlement, and if Barwell did not, she would personally pay Adams an amount equal to the referral fee. When asked about the terms of his alleged contract with Morningstar, he made no mention of any promise he made to her. Adams indicated that in anticipation of receiving the referral fee, he advanced "[i]n excess of $20,000" for the construction of a home. In response to requests for all documents related to the construction and funds he expended on it, Adams produced copies of receipts and construction proposals which totaled around $15,000. The documents were either undated or dated prior to November 14, 2018, the date Adams stated Morningstar first made her alleged promise to him.

{¶5} Morningstar supplemented her motion for summary judgment based on the discovery responses. Adams opposed the motion but did not submit any additional summary judgment evidence. In an April 24, 2020 entry, the trial court granted Morningstar's motion. With respect to the breach of contract claim, the court found no contract existed due to a lack of consideration. The court explained that even if Morningstar had promised to pay the referral fee after the conclusion of her lawsuit, there

was no consideration for her promise because she "did not and would not receive a benefit from" Adams. The alleged referral to Duncan was not consideration because it happened "three years prior" without Morningstar's agreement to pay a referral fee. With respect to the promissory estoppel claim, the court found Adams had "no reasonable and foreseeable right to rely on a gratuitous promise which [Morningstar] could withdraw at any time."

{¶6}    In October 2020, the court conducted a bench trial on Morningstar's counterclaims.  Adams testified that he is a sports agent and retired lawyer who practiced law from 1984 until 2016.  Around 2015, Morningstar's father, his friend and property caretaker, communicated with him about a potential employment case Morningstar had. Without having ever met Morningstar, he referred the matter to Duncan.  Adams testified that he and Duncan had a "standard" oral referral fee agreement.  If Adams referred a case to Duncan and he achieved a "small" settlement, i.e., "a couple hundred thousand," Adams "wouldn't ask for anything."  If the settlement was more than that, Duncan would give Adams 20 percent of the attorney fees.  Adams suggested it is proper under the Ohio Rules or Professional Conduct for attorneys to have referral fee agreements but did not provide evidence of any rule permitting them.

{¶7}    Adams admitted that he did not participate in Morningstar's employment case.  He contacted her for the first time on October 31, 2018, after the case had settled. Morningstar's father asked Adams to contact Morningstar because she was dissatisfied with the settlement, angry with her lawyers, and wanted her job back. Adams met Morningstar five times: twice at Corazon in Dublin, Ohio,[1] twice at Bob Evans, and once

---

[1] Corazon is a mixed-use facility which includes office space and a restaurant.

at Roosters. During the first Corazon meeting, they met at his office and discussed "many subjects," including getting her job back, and Adams offered to assist her. They did not discuss the referral fee. At the second Corazon meeting, a dinner at which Francis Kovacs-Colon was present, Morningstar's father asked Adams if he was "getting taken care of?" Adams said, "Yeah, don't worry about it, I'm being taken care of." Morningstar said, "Don't worry about it, I am making sure that you get paid." She also said that she was going to pay Adams if her attorneys did not.

{¶8} Adams claimed that Morningstar committed to paying him $100,000, but he admitted that he was not providing anything to Morningstar for her alleged commitment and that he did not provide her with any benefit at any time. Subsequently, Adams testified that a mutual exchange of promise is valid consideration under Ohio law and that the mutual exchange of promise here was that he committed to help Morningstar get her job back and find a new attorney. She was angry at Barwell because he settled her case for only $900,000 and did not try to get her job back. Adams testified that he consulted with Morningstar "numerous times" about a strategy for getting her job back but acknowledged that he did not do $100,000 worth of work for her and was unable to place a value on the work he did. However, Morningstar promised to pay him "multiple times," and because he believed her, he advanced funds to accelerate construction on a house at some point. He testified Morningstar was aware of the project as her father was helping with it.

{¶9} On December 4, 2018, Adams sent the following email to Duncan and Barwell, which he testified Morningstar encouraged him to send:

> Guys I have tried repeatedly to discuss this issue but everyone seems to be too busy.

Amie and I have repeatedly spoken about making a play to get her job back and the referral fee she has authorized to be paid to me. But I can provide little guidance without the ability to talk to both of you. Amie is looking for her money. I am looking for my fee and I can't assist her not knowing when the check is being disbursed.

Can someone please communicate with me so that I may schedule a meeting with the Circleville Mayor.

As to my fees, Amy will pay me directly if one or both of you are concerned about sharing fees with a retired lawyer. It is not an issue as the referral was made when I was practicing but it is a further non issue if the fees are reduced proportionately so that she may pay me directly.

Please advise as Amie will not authorize the settlement without addressing my referral fee.

The next day, Barwell emailed Adams that even if he was an attorney at the time of the referral, he never participated in the case, and Prof.Cond.R. 1.5(e) prevented Barwell and Duncan from sharing a fee with him. Adams responded minutes later, insisting he had worked on the case.

{¶10} On December 17, 2018, Adams texted Morningstar: "I committed that money Aimee [sic] and my leverage was you not executing the agreement until they paid me. Just wish you would have told me so I could have protected myself." Morningstar responded, "Are you shitting me right now?" Adams texted, "Not sure what you mean?" Morningstar then texted, "Look I don't want my job back. Anything else that's an issue doesn't involve me." On April 8, 2019, Adams texted Morningstar about his disappointment that she did not keep her "contractual commitment" to him and how he had "detrimentally relied on" her "promise to pay" him and intended to sue her and Barwell. He offered to accept "1/2 the amount owed or $50,000" if she testified against Barwell so Adams could collect "the balance" from him. He also stated, "I am still at a

total loss as to why you did this when you even offered to pay me directly and I refused when the money should have been taken from the settlement."

**{¶11}** Adams admitted that his only effort to collect the referral fee from Duncan was to send him a November 5, 2018 invoice from Adams Partners Limited for $10,000. Adams testified that he provided the invoice at Duncan's request, and Duncan gave him "part of his fee that he collected." The invoice states it is regarding "Amie Morningstar; public relations and media representation; consulting services re [sic] book and movie rights." Adams admitted that Adams Partners Limited never represented Morningstar but claimed he had discussed movie rights with her.

**{¶12}** Attorney Gregory Barwell testified that in 2015, Duncan asked him to assist with Morningstar's employment case and introduced him to her. At the time, Barwell did not know Adams or that he had referred the matter to Duncan. In August 2018, the case went to trial, and it settled around October 2018. In early November 2018, Adams contacted Barwell and Duncan about the settlement. Adams wanted a referral fee but Barwell did not believe Adams was entitled to one because Barwell never promised him one, Adams did not assist Barwell with the employment case, and payment of a referral fee would violate the Ohio Rules of Professional Conduct. Barwell testified, "There's no underlying other conduct that attorneys have to follow except what we follow in our rules, and I wasn't willing to neglect my duty regarding those."

**{¶13}** Morningstar gave the following testimony. She was formerly a firefighter for the city of Circleville but is currently unemployed. Duncan, Barwell, and other attorneys from Barwell's firm represented her in an employment case against the city. Morningstar heard about Duncan from her father, and it was Duncan's idea to bring in Barwell too.

She knew someone her father worked for was involved in getting Duncan on her case, but at the time, did not know that person was Adams. Her fee agreements with Duncan and Barwell made no mention of Adams. After her case settled, she had concerns about the amount of the settlement, the tax consequences of it, and regaining employment, and Adams contacted her for the first time.

{¶14} Adams and Morningstar met four times between early November 2018 and early December 2018. First, they met at his office at Corazon. Adams told her about his relationship with her father, that her father said she was worried about taxes, and that Adams could help her. He never mentioned being owed money. Second, Morningstar had dinner at Corazon with Adams and her father. Adams "casually" mentioned that the lawyers in her case owed him money but did not say how much. She was "completely embarrassed." Morningstar "had no idea what he was talking about" or that he had been involved in her case. She was "very apologetic" and told him that if her lawyers owed him money, she wanted him to get it and "would see that he was paid." She did not promise to personally pay him then or ever. No other business was discussed at the dinner. Third, Morningstar had dinner with Adams at Roosters; they did not discuss business matters. Fourth, on December 4, 2018, Morningstar met Adams for brunch at Bob Evans.

{¶15} Prior to the brunch, Adams told Morningstar that her attorneys said they could not pay him the referral fee because he was not a lawyer anymore, so she suggested her lawyers give the money to her and she give it to him. During the brunch, Adams talked about the referral fee and requested and received her permission to contact her lawyers. She did not know what Adams planned to say to them but did receive a copy of the email he sent Barwell and Duncan that day. It upset her because she and Adams

"never had any kind of agreement." She had talked to him about wanting her job back, and during the brunch, Adams indicated he could help, but she never asked him to do that for her. Morningstar acknowledged that during the brunch, she did not disclose to Adams that she had already authorized the itemization for the distribution of settlement funds, which did not mention him. It became clear to her that Adams was not entitled to anything. His explanation about why he was owed money "changed multiple times," he did not have a written contract, he did not personally refer her to Duncan, and she did not understand why a referral "would be worth a chunk of money."

{¶16} The court dismissed Morningstar's counterclaims. Adams then filed a notice of appeal indicating that he was appealing the summary judgment decision. We dismissed the appeal because Adams failed to perfect it after receiving notice of and an opportunity to correct the deficiencies.

{¶17} Morningstar moved the trial court for sanctions against Adams and his attorney under R.C. 2323.51 for frivolous conduct. At the R.C. 2323.51 hearing, the court indicated it would consider evidence presented during the October 2020 bench trial. In addition, attorney Francis Kovacs-Colon testified that he is friends with Adams. Adams introduced him to Morningstar and her father at Corazon. They were celebrating a favorable outcome on a claim Morningstar had made against a fire department. Morningstar mentioned that she "would be sure that [Adams] would be paid compensation for his services and involvement." Kovacs-Colon believed the amount "was a hundred thousand dollars." Adams said he thought "the attorneys will probably take care of that," and Morningstar said she would make sure he was "taken care of and paid." Kovacs-Colon did not recall Adams making any promises to Morningstar. Kovacs-Colon testified

that Morningstar and Adams spoke as if they had an existing contract, not as if they were making one.  However, he did not know what work Adams had done on her case.

{¶18} The trial court issued a detailed decision on the parties' requests for frivolous conduct sanctions.  The court observed that the April 8, 2019 text message[2] in which Adams threatened to sue Morningstar did not mention that she owed him for professional services.  The court further observed that Adams did not claim that he agreed to help Morningstar get her job back in his pleadings, discovery responses, or memorandum contra to the motion for summary judgment.  In addition, the court noted that it was difficult to believe Circleville would rehire Morningstar.  The court found that when Adams filed his complaint and amended complaint, he knew or should have reasonably known:

- That he met Defendant for the first time after the verdict in her employment case.

- That prior to or during her litigation, Defendant had not agreed to pay a referral fee to him.

- That Attorney Duncan agreed to pay a referral fee to him, but Plaintiff did not so advise Defendant.

- That Attorney Barwell had not agreed to pay a referral fee to Plaintiff.

- That Defendant's alleged belief that she was obligated to pay a referral fee to Plaintiff if Attorney Barwell did not was legally inaccurate.

- That he did not work on Defendant's employment case and was not entitled to a referral fee pursuant to Ohio Rule of Professional Responsibility 1.5.

- That even had he been entitled to a referral fee, it would be paid from the attorney's share of the litigation award and not Defendant's.

- That he had to provide some benefit to Defendant before an oral contract existed.

---

[2] The court incorrectly referred to this text message as an email.

- That Defendant could withdraw her gratuitous promise to pay any time prior to Plaintiff bestowing a benefit on her.

- That Plaintiff's demand for $100,000 was far in excess of any benefit which he provided to Defendant.

**{¶19}** The court concluded that Adams's amended complaint and actions in prosecuting it were frivolous conduct under R.C. 2323.51(A)(2)(a)(ii)-(iv) and stated:

> The amended complaint is not warranted by existing contract and promissory estoppel law as explained in the April 24, 2020, entry. The amended complaint cannot be supported by a good faith argument for an extension, modification or reversal of existing law and cannot be supported by a good faith argument for the establishment of a new law. The amended complaint has no evidentiary support and is not warranted by the evidence.

The court found Morningstar was adversely affected by the frivolous conduct because she spent time and money defending against Adams's claims. The court awarded her judgment against Adams for $28,195 in attorney fees plus interest and court costs but dismissed her request for sanctions against his attorney and Adams's request for sanctions against her.

## II.  ASSIGNMENT OF ERROR

**{¶20}**  Adams presents one assignment of error:  "The trial court erred by entering judgment for Appellee Morningstar and against Appellant Adams on Morningstar's counterclaim for frivolous conduct under R.C. § 2323.51."[3]

## III.  LAW AND ANALYSIS

**{¶21}**  In his sole assignment of error, Adams contends that the trial court erred when it entered judgment in favor of Morningstar under R.C. 2323.51.

---

[3] The trial court entered the judgment on a motion for frivolous conduct, not a counterclaim.

{¶22} R.C. 2323.51(B)(1) provides that with exceptions not relevant here, "any party adversely affected by frivolous conduct" in a civil action "may file a motion for an award of court costs, reasonable attorney's fees, and other reasonable expenses incurred in connection with the civil action." "The court may assess and make an award to any party to the civil action * * * who was adversely affected by frivolous conduct * * *." R.C. 2323.51(B)(1). "Conduct" includes "[t]he filing of a civil action, the assertion of a claim, defense, or other position in connection with a civil action, the filing of a pleading, motion, or other paper in a civil action, including, but not limited to, a motion or paper filed for discovery purposes, or the taking of any other action in connection with a civil action[.]" R.C. 2323.51(A)(1)(a). "Frivolous conduct" includes conduct of a party which satisfies any of the following:

> (i) It obviously serves merely to harass or maliciously injure another party to the civil action or appeal or is for another improper purpose, including, but not limited to, causing unnecessary delay or a needless increase in the cost of litigation.

> (ii) It is not warranted under existing law, cannot be supported by a good faith argument for an extension, modification, or reversal of existing law, or cannot be supported by a good faith argument for the establishment of new law.

> (iii) The conduct consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

> (iv) The conduct consists of denials or factual contentions that are not warranted by the evidence or, if specifically so identified, are not reasonably based on a lack of information or belief.

R.C. 2323.51(A)(2)(a).

{¶23} In this case, the trial court found R.C. 2323.51(A)(2)(a)(ii)-(iv) applicable. Whether conduct is not warranted under existing law, cannot be supported by a good faith

argument for an extension, modification, or reversal of existing law, or cannot be supported by a good faith argument for the establishment of new law presents a legal question we review de novo. *See Isaac v. Malott*, 4th Dist. Pickaway Nos. 18CA9 & 18CA10, 2019-Ohio-3210, ¶ 64 ("When the question regarding what constitutes frivolous conduct calls for a legal determination, such as whether a claim is warranted under existing law, an appellate court is to review the frivolous conduct determination de novo, without reference to the trial court's decision"). Whether allegations or other factual contentions have no evidentiary support and whether denials or factual contentions are not warranted by the evidence are questions related to the sufficiency, rather than the weight, of the evidence in support of a position and are also legal questions we review de novo. *See generally Emerson v. Erie Cty. Bd. of Revision*, 149 Ohio St.3d 148, 2017-Ohio-865, 73 N.E.3d 496, ¶ 13 ("We consider questions involving legal sufficiency—for example, whether a certain type of evidence tends to prove an ultimate fact—de novo").

**{¶24}** If a trial court finds there was frivolous conduct under R.C. 2323.51, the court has discretion to grant or deny sanctions for it. *See State ex rel. Striker v. Cline*, 130 Ohio St.3d 214, 2011-Ohio-5350, 957 N.E.2d 19, ¶ 10 ("The General Assembly vests the decision whether to award sanctions, including an award of reasonable attorney fees, in the court"). " 'We will not reverse a lower court's decision on whether to award sanctions under R.C. 2323.51 absent an abuse of discretion.' " *State ex rel. Davis v. Metzger*, 145 Ohio St.3d 405, 2016-Ohio-1026, 49 N.E.3d 1293, ¶ 10, quoting *Striker* at ¶ 11. "To prove abuse of discretion, the appealing party must show that the lower court's decision to grant attorney fees was unreasonable, arbitrary, or unconscionable." *Id.*

## A.  Breach of Contract Claim

**{¶25}** "To prevail on a breach of contract claim, the claimant must demonstrate each of the following: (1) the existence of a contract; (2) performance by the claimant; (3) breach by the opposing party; and (4) damage or loss to the claimant that resulted from the opposing party's breach." *Portsmouth Ins. Agency v. Med. Mut. of Ohio*, 4th Dist. Scioto No. 10CA3405, 2012-Ohio-2046, ¶ 81.  " ' "A contract is generally defined as a promise, or a set of promises, actionable upon breach.   Essential elements of a contract include   an   offer,   acceptance,   contractual   capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." ' "  *Williams v. Ormsby*, 131 Ohio St.3d 427, 2012-Ohio-690, 966 N.E.2d 255, ¶ 14, quoting *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976).

**{¶26}** " '[M]utual assent is normally manifested by offer and acceptance. An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his [or her] assent to that bargain is invited and will conclude it.' "  *Hurst v. Hurst*, 4th Dist. Ross No. 07CA2980, 2008-Ohio-3462, ¶ 14, quoting *McSweeney v. Jackson*, 117 Ohio App.3d 623, 631-632, 691 N.E.2d 303 (4th Dist.1996).  "This manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by the failure to act." *Id.*  "Consideration may consist of either a detriment to the promisee or a benefit to the promisor." *Williams* at ¶ 16.  "A benefit may consist of some right, interest, or profit accruing to the promisor, while a detriment may consist of some forbearance, loss, or responsibility given, suffered, or

undertaken by the promisee." *Id.* " 'To constitute consideration, the benefit or detriment must be "bargained for." Something is bargained for if it is sought by the promisor in exchange for his [or her] promise and is given by the promisee in exchange for that promise.' " (Citation omitted sic.) *Bono v. McCutcheon*, 159 Ohio App.3d 571, 2005-Ohio-299, 824 N.E.2d 1013, ¶ 9 (2d Dist.), quoting *Carlisle v. T & R Excavating, Inc.*, 123 Ohio App.3d 277, 283, 704 N.E.2d 39 (9th Dist.1997). Although "courts may not inquire into the adequacy of consideration," "whether there is consideration at all is a proper question for a court." *Williams* at ¶ 17.

**{¶27}** Adams contends that he had an evidentiary basis for his breach of contract claim and that it was reasonable to bring it. He maintains there is evidence that Morningstar offered to pay him, that he offered to help her get her job back and find a new attorney, and that she "did not decline that help," which indicates there was an offer, acceptance, and a manifestation of mutual assent. He claims there is evidence Morningstar's promise was supported by consideration—his promise to help her get her job back and find a new attorney. Adams asserts that the trial court erred in discounting evidence of his promise because his pleadings did not mention it and the court did not believe Circleville was likely to rehire Morningstar or that the services he offered were worth $100,000. Adams observes that Ohio is a notice pleading state and that courts cannot inquire into the adequacy of consideration. Adams also claims the court incorrectly found that he knew or should have reasonably known that he had to provide Morningstar a benefit for there to be an oral contract and that she could withdraw her gratuitous promise to pay any time before he bestowed a benefit on her. He maintains that he only had to promise Morningstar a benefit for an oral contract to exist and that she

could not withdraw her promise "just because she had not yet realized a promised future benefit."

**{¶28}** The trial court correctly found that Adams engaged in frivolous conduct with respect to his breach of contract claim. The amended complaint alleged that Morningstar breached a contract in which she guaranteed payment of a referral fee. Although the amended complaint alleged there was consideration for this alleged promise, it did not articulate what that consideration was, and Adams made no mention of it in his discovery responses. In responding to Morningstar's motion for summary judgment, which argued lack of consideration, Adams did not argue about or present any evidence of consideration. It was only after dismissal of the breach of contract claim that he argued consideration existed because he promised to help Morningstar get her job back and find a new attorney.

**{¶29}** Even if the trial court somehow erred in its analysis of this belated argument, such error is harmless because the argument lacks evidentiary support. *See generally State v. Sebastian*, 4th Dist. Highland No. 08CA19, 2009-Ohio-3117, ¶ 25, quoting *Reynolds v. Budzik*, 134 Ohio App.3d 844, 846, 732 N.E.2d 485, fn. 3 (6th Dist.1999) (" 'when a trial court has stated an erroneous basis for its judgment, an appellate court must affirm the judgment if it is legally correct on other grounds, that is, it achieves the right result for the wrong reason, because such an error is not prejudicial' "). Adams testified that he offered to help Morningstar get her job back during their first meeting at Corazon. He did not testify that this offer was dependent on Morningstar guaranteeing payment of the referral fee. Adams and Morningstar agreed they did not even discuss the referral fee at that meeting.

{¶30} They did discuss the referral fee during the Corazon dinner meeting. Adams, Morningstar, and Kovacs-Colon had different recollections about statements Morningstar made then.   But none of them recounted any discussion about Adams promising to help Morningstar get her job back or find a new attorney in exchange for her guaranteeing payment of the referral fee.   Adams testified that Morningstar made her promise in response to an inquiry by her father about whether Adams was "getting taken care of."   Adams admitted that he was not providing Morningstar with anything for her commitment to him.   His subsequent attempt to backtrack on this admission by offering conclusory testimony about his alleged promise to help Morningstar being part of a mutual exchange of promise is not evidence of consideration.   There is no evidence that Morningstar sought Adams's alleged promise in exchange for her own or that he made his alleged promise in exchange for hers.   Therefore, there is no evidence that his alleged promise was consideration for Morningstar's alleged promise.

{¶31} The trial court correctly found that Adams engaged in frivolous conduct under R.C. 2323.51(A)(2)(a)(iii) with respect to his breach of contract claim.   He alleged that claim when there was no evidentiary support for an essential element of it—the existence of a contract.   As a result, it is immaterial whether the alternative grounds on which the trial court found Adams engaged in frivolous conduct with respect to that claim are applicable.

B.  Promissory Estoppel

{¶32} "Promissory estoppel is a quasicontractual or equitable doctrine." *Simon v. Aulino*, 2020-Ohio-6962, 165 N.E.3d 706, ¶ 62 (4th Dist.).   Under the doctrine, " '[a] promise which the promisor should reasonably expect to induce action or forbearance on

the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' " *McCroskey v. State*, 8 Ohio St.3d 29, 30, 456 N.E.2d 1204 (1983), quoting Restatement of the Law 2d, Contracts, Section 90 (1973). "In order to prevail on a claim of promissory estoppel, plaintiff must show a clear and unambiguous promise and reliance by the party to whom the promise is made. The reliance must be reasonable and foreseeable, and the party relying on the promise must have been injured by the reliance." *Simon* at ¶ 62. The plaintiff " ' "must have relied on conduct of an adversary in such a manner as to change [the plaintiff's] position for the worse and that reliance must have been reasonable in that the party claiming estoppel did not know and could not have known that its adversary's conduct was misleading." ' " *Olympic Holding Co. v. ACE Ltd.*, 122 Ohio St.3d 89, 2009-Ohio-2057, 909 N.E.2d 93, ¶ 39, quoting *Shampton v. Springboro,* 98 Ohio St.3d 457, 2003-Ohio-1913, 786 N.E.2d 883, ¶ 34, quoting *Ohio State Bd. of Pharmacy v. Frantz*, 51 Ohio St.3d 143, 145, 555 N.E.2d 630 (1990).

**{¶33}** Adams contends that he had an evidentiary basis for his promissory estoppel claim and that it was reasonable to bring it. Adams asserts that the court erred when it found the promissory estoppel claim frivolous on the ground that he had no reasonable and foreseeable right to rely on a gratuitous promise Morningstar could withdraw at any time. Adams claims there was consideration for her alleged promise, but we rejected that contention in the previous section. Alternatively, Adams asserts that gratuitous promises can be enforced under promissory estoppel.

**{¶34}** We agree with Adams that the trial court erred when it indicated that reliance on a gratuitous promise is inherently unreasonable and unforeseeable. " ' "The doctrine

of promissory estoppel * * * arose to provide a remedy through *the enforcement of a gratuitous promise.*" ' " (Emphasis added.) *Hortman v. Miamisburg*, 110 Ohio St.3d 194, 2006-Ohio-4251, 852 N.E.2d 716, ¶ 24, quoting *Black's Law Dictionary* 591 (8th Ed.2004), quoting Ann Taylor Schwing, *California Affirmative Defenses*, Section 34:16, 35 (2d Ed.1996). The doctrine " 'is a quasi-contractual concept where a court in equity seeks to prevent injustice by effectively creating a contract where none existed by supplying the element of consideration when necessary.' " *J & B Fleet Indus. Supply, Inc. v. Miller*, 7th Dist. Mahoning No. 09 MA 173, 2011-Ohio-3165, ¶ 82, quoting *TLC Health Care Servs., L.L.C. v. Enhanced Billing Servs., L.L.C.,* 6th Dist. Lucas No. L-08-1121, 2008-Ohio-4285, ¶ 24.

**{¶35}** Although the trial court gave an erroneous basis for its determination that Adams engaged in frivolous conduct with respect to his promissory estoppel claim, the court correctly found that he engaged in such conduct. *See generally Sebastian*, 4th Dist. Highland No. 08CA19, 2009-Ohio-3117, at ¶ 25, quoting *Reynolds*, 134 Ohio App.3d 844, 846, 732 N.E.2d 485, fn. 3 (" 'when a trial court has stated an erroneous basis for its judgment, an appellate court must affirm the judgment if it is legally correct on other grounds, that is, it achieves the right result for the wrong reason, because such an error is not prejudicial' "). Adams's testimony provides some evidentiary support for his assertion that he relied on Morningstar's alleged promise and was injured by the reliance, even though the credibility of that testimony is questionable given the lack of documentary evidence to support it. However, there is no evidentiary support for Adams's assertion that any such reliance was reasonable.

**{¶36}** Adams claims he had a good faith basis to allege reasonable reliance because Morningstar "had received or was about to receive the proceeds of a substantial settlement," and he "had a long relationship with her father." But these facts are insignificant because Adams knew or should have known that Morningstar's alleged promise to pay him a $100,000 referral fee—over 10 percent of the $900,000 settlement which he knew she believed to be inadequate—if her attorneys did not pay the fee was misleading. Implicit in this alleged promise is a belief that Adams was entitled to a referral fee from Morningstar's attorneys. Adams knew or should have known that he was not under the Ohio Rules of Professional Conduct.

**{¶37}** Duncan's promise to divide attorney fees in the employment case with Adams to compensate him for recommending Duncan's services conflicted with Prof.Cond.R. 1.5(e),[4] which states:

> Lawyers who are not in the same *firm* may divide fees only if all of the following apply:
>
> (1) the division of fees is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation and agrees to be available for consultation with the client;
>
> (2) the client has given *written* consent after full disclosure of the identity of each lawyer, that the fees will be divided, and that the division of fees will be in proportion to the services to be performed by each lawyer or that each lawyer will assume joint responsibility for the representation;
>
> (3) except where court approval of the fee division is obtained, the *written* closing statement in a case involving a contingent fee shall be signed by the client and each lawyer and shall comply with the terms of division (c)(2) of this rule;
>
> (4) the total fee is *reasonable*.

---

[4] We note that the promise also conflicted with Prof.Cond.R. 7.2(b), which prohibits a lawyer from giving "anything of value to a person for recommending the lawyer's services" with exceptions not applicable here. However, no evidence was offered with respect to that rule during the proceedings below.

(Emphasis sic.)  Duncan could not divide the fees with Adams, who was not in the same firm as Duncan, performed no services on the employment case, and did not assume joint responsibility for the representation.

**{¶38}** There is circumstantial evidence that before Morningstar first made her alleged promise on November 14, 2018, Adams knew his referral fee arrangement with Duncan was improper.  Adams's only effort to collect the referral fee from Duncan was a November 5, 2018 invoice for $10,000, which Duncan paid from the attorney fees he collected in the employment case.  However, the invoice made no mention of a referral fee.  The invoice indicated Adams was entitled to compensation for providing Morningstar with public relations and media representation and with consulting services regarding book and movie rights.  Adams admitted he never represented Morningstar, and though he claimed they talked about movie rights, there is no evidence of any agreement for him to receive a $10,000 consulting fee.  This evidence suggests Adams created and Duncan paid a fake invoice to conceal the fact that Duncan was paying Adams a referral fee from the attorney fees in the employment case.

**{¶39}** Even if Adams did not have actual notice of Prof.Cond.R. 1.5(e) at the time Morningstar made her alleged promise, Adams should have known the rules of conduct governing the profession he engaged in for over 30 years.  "Attorneys must comply with the ethical requirements imposed * * * by the Rules of Professional Conduct." *Disciplinary Counsel v. Zigan*, 118 Ohio St.3d 180, 2008-Ohio-1976, 887 N.E.2d 334, ¶ 25.  "Lawyers are on notice that if they wish to continue practicing law in Ohio, they must abide by the Ohio Rules of Professional Conduct."  *Cecil & Geiser, L.L.P. v. Plymale*, 10th Dist. Franklin No. 12AP-398, 2012-Ohio-5861, ¶ 9.

**{¶40}** In addition, there is evidence that Adams had actual notice of Prof.Cond.R. 1.5(e) by December 5, 2018. That day, Barwell sent him an email which cited the rule and quoted most of it. Adams responded to the email, insinuating the rule did not apply because he had worked on the employment case, which was patently false.

**{¶41}** No reasonable trier of fact could find that Adams's claimed reliance on Morningstar's alleged guarantee of payment of a referral fee was reasonable. He knew or should have known that Morningstar made the promise because she incorrectly believed that Adams was entitled to a referral fee from her lawyers. This is not a situation where injustice can be avoided only by enforcement of an alleged promise. Rather, enforcement would create injustice. Enforcement would allow Adams to take advantage of an alleged promise by Morningstar which he knew or should have known was premised on an incorrect belief. Enforcement would also allow him to use the equitable doctrine of promissory estoppel to circumvent the Ohio Rules of Professional Conduct.

**{¶42}** The trial court correctly found that Adams engaged in frivolous conduct under R.C. 2323.51(A)(2)(a)(iii) with respect to his promissory estoppel claim. He alleged that claim when there was no evidentiary support for an essential element of it— reasonable reliance. As a result, it is immaterial whether the alternative grounds on which the trial court found Adams engaged in frivolous conduct with respect to that claim are applicable.

### IV.  CONCLUSION

**{¶43}** The trial court correctly found that Adams engaged in frivolous conduct with respect to his breach of contract and promissory estoppel claims, and Adams does not argue that, after making that finding, the trial court abused its discretion in granting

sanctions for his frivolous conduct.  Therefore, we conclude that the trial court did not err when it entered judgment in favor of Morningstar under R.C. 2323.51.  We overrule the sole assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## <u>JUDGMENT ENTRY</u>

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pickaway County Common Pleas Court to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.: Concur in Judgment and Opinion.

For the Court

BY: _____
Michael D. Hess, Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**